UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

HEALTHGUARD OF LANCASTER, INC.
        Plaintiff

    vs.

MARK GARTENBERG; STEVEN
GARTENBERG; MARK TISCHLER;
GREENFIELD SPORTS MEDICINE &
REHAB, P.C.; PREMIER SPORTS
MEDICINE & REHAB CENTER, P.C.; and
MAIN LINE MEDICAL SERVICES, INC.
        Defendants

NO. 02-CV-2611
(Michael M. Baylson, J.)

## DEFENDANTS' MEMORANDUM ON LEGAL ISSUES

In accordance with the Court's Pre-Trial Order dated September 13, 2002, defendants

respectfully submit as their memorandum on legal issues involved in this case the attached copy

of their memorandum of law in support of their joint motion for summary judgment (without

exhibits).  Defendants reserve the right to submit supplemental legal memoranda as appropriate.

JOHN W. MORRIS, Attorney at Law

OBERMAYER REBMANN MAXWELL
& HIPPEL LLP

_____

John W. Morris, Esq.
1525 Locust Street, 17th Floor
Philadelphia, PA  19102
215-772-2290

Attorney for Defendants Mark Tischler,
Greenfield Sports Medicine & Rehab, P.C.,
and Premier Sports Medicine & Rehab, P.C.

_____

Lawrence J. Tabas, Esquire
Richard P. Limburg, Esquire
One Penn Center – 19th floor
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103
215-665-3000

Attorneys for Defendants Steve Gartenberg,
Mark Gartenberg, and Main Line Medical
Services, Inc.

Dated:  October 30, 2003

493176

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

HEALTHGUARD OF LANCASTER, INC.
    Plaintiff

    vs.

MARK GARTENBERG; STEVEN
GARTENBERG; MARK TISCHLER;
GREENFIELD SPORTS MEDICINE &
REHAB, P.C.; PREMIER SPORTS
MEDICINE & REHAB CENTER, P.C.; and
MAIN LINE MEDICAL SERVICES, INC.
    Defendants

NO. 02-CV-2611
(Michael M. Baylson, J.)

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT**

This motion summary judgment is made pursuant to Fed.R.Civ.P. 56, and is filed jointly

on behalf of defendants Mark Tischler, Greenfield Sports Medicine & Rehab, P.C.

("Greenfield"), Premier Sports Medicine & Rehab, P.C. ("Premier"), Steve Gartenberg, Mark

Gartenberg, and Main Line Medical Services, Inc. ("MLM").  For the reasons set forth below,

judgment should be entered against HealthGuard on its civil RICO claims and state fraud claims.

## I.    INTRODUCTION

In pleading its RICO case and thereby claiming federal jurisdiction, Plaintiff has alleged

that it has been defrauded through Defendants' operation of an enterprise, Main Line Medical

Services, Inc. ("MLM").  Plaintiff alleges that the individual and corporate Defendants owned

and controlled MLM and used that entity to defraud the Plaintiff insurance carrier by submitting

false bills for medical services rendered to patients of Greenfield and Premier.  Plaintiff has

claimed that every bill, totaling $344,859, was for unnecessary, inappropriate, or nonexistent

services and that MLM, and ultimately the individual Defendants, wrongly profited thereby. Plaintiff alleges that this open-ended scheme presents grave danger of continuing racketeering activity.

The uncontradicted evidence in the case demonstrates that each premise of Plaintiff's claim is incorrect.  The evidence not only fails to support, but indeed also contradicts Plaintiff's entire RICO case.  As fully set forth below, MLM was not owned or controlled by Mark Tischler, Greenfield, or Premier.  It was in fact owned by Steven Gartenberg.  More importantly, MLM, the alleged racketeering enterprise, had almost nothing to do with the operation of Greenfield or Premier, and it most certainly did not submit bills to or collect money from the Plaintiff.  Most importantly, contrary to Plaintiff's thunderous claim for every cent ever billed, it has been able to identify only three procedures involving $341.09, which it specifically disputes. Although Plaintiff's more recent offerings proclaim a generalized displeasure with Greenfield's protocols and record-keeping, the evidence portrays no scheme to defraud, but rather a mere billing dispute, and an untimely one at that.  Finally, Plaintiff's projected fears of ongoing depredation is belied by the fact that both Greenfield and Premier were immediately put out of business by Plaintiff's unilateral refusal to pay any claims submitted by those companies.  Nor is there any evidence that MLM will, would, or has ever billed or received one cent from Plaintiff.

In this Memorandum, Defendants will initially review the continuing deficiencies in Plaintiff's pleading of its RICO case.

After reviewing the pleadings and evidence in this case, Defendants will argue that there is no support for Plaintiff's central proposition that it was defrauded through Defendants' operation of the MLM enterprise.  Defendants will also argue that Plaintiff has failed to show the

requisite "continuity" of racketeering activity and that there is no demonstrated scheme to defraud, through MLM or anyone else.

## II.    STANDARD FOR SUMMARY JUDGMENT

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).

> The moving party has the initial burden of identifying the evidence that demonstrates the absence of a genuine issue of material fact, [but] the respondent (the "non-movant") must establish the existence of each element on which it bears the burden of proof.

J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990) cert. denied, 499 U.S. 921 (1991), citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

At the summary judgment stage of a RICO action, if the movant can point to the absence of any factual support for any essential element of the claim, then the non-movant must demonstrate specific facts showing a need for trial.  Annulli v. Panaker, 200 F. 3d 189 (3d Cir. 1999).

## III.    ATTACHED PLEADINGS AND DISCOVERY

The defendants attach the following pleadings, discovery responses and deposition transcripts as Exhibits in support of their motion for summary judgment:

Exhibit A – HealthGuard's Amended Complaint, with exhibits

Exhibit B – HealthGuard's RICO Case Statement

Exhibit C – HealthGuard's Answers to First Set of Interrogatories

Exhibit D – HealthGuard's Answers to Second Set of Interrogatories

493176

Exhibit E – Answer of Tischler to Amended Complaint

Exhibit F – Mark Tischler's Answers to Interrogatories

Exhibit G – Answer of Greenfield to Amended Complaint

Exhibit H – Answer of Premier to Amended Complaint

Exhibit I – Answer of Gartenbergs and MLM to Amended Complaint

Exhibit J – Steve Gartenberg's Answers to Interrogatories

Exhibit K – Mark Gartenberg's Answers to Interrogatories

Exhibit L – MLM's Answers to Interrogatories

Exhibit M – August 20, 2003 Deposition of Dr. David Raab

## IV.    PLAINTIFF'S RICO PLEADING REMAINS FATALLY DEFICIENT

### A.    HealthGuard's Amended Complaint

HealthGuard filed its original complaint on May 6, 2002.  Defendants filed a motion to dismiss which was granted on December 6, 2002 with leave to file an amended complaint.  In dismissing the complaint, this Court stated:

> Plaintiff vaguely refers to acts of mail fraud and wire fraud, but it fails to specify these alleged acts, or to explain how each of these acts furthered the scheme to defraud or was incident to an essential part of that scheme.  Also, … the Complaint does not contain sufficient allegations as to enterprise, relatedness, or continuity.

Order of December 6, 2002, page 5.

HealthGuard filed its amended complaint on December 24, 2002.  A copy of the Amended Complaint with exhibits is attached hereto as Exhibit A.  In its amended complaint, HealthGuard again fails to specify the predicate acts of mail fraud or explain how they furthered the alleged scheme to defraud or were incident to an essential part of that scheme (Exhibit A, Amended Complaint, ¶¶21(n), 22 and 33).  Likewise, HealthGuard's amended allegations

concerning relatedness and continuity are nothing but legal conclusions (Exhibit A, Amended

Complaint, ¶34).

The following table compares the mail fraud allegations in the original complaint with

the mail fraud allegations in the amended complaint.

| ORIGINAL COMPLAINT | AMENDED COMPLAINT |
|---|---|
| 21(n)   Defendants caused employees of Greenfield, Premier and/or MLM to submit claims via <u>mail and/or wire</u> to Plaintiff for services rendered under the name and provider number of a medical or osteopathic doctor employed by and/or affiliated with Greenfield or Premier, whether or not the doctor actually rendered the services. | 21(n)   Defendants caused employees of Greenfield, Premier and/or MLM to submit claims via <u>U.S. Mail</u> to Plaintiff for services rendered under the name and provider number of a medical or osteopathic doctor employed by and/or affiliated with Greenfield or Premier, whether or not the doctor actually rendered the services. |
| 22.       Defendants, having devised the scheme described herein, and in their capacity as officers, directors, managers, shareholders, supervisors or otherwise controlling persons of Greenfield, Premier and MLM, knowingly and repeatedly caused claim forms to be delivered by <u>mail and/or wire</u> to Plaintiff for the purpose of executing such scheme. | 22.       Defendants, having devised the scheme described herein, and in their capacity as officers, directors, managers, shareholders, supervisors or otherwise controlling persons of Greenfield, Premier and MLM, knowingly and repeatedly caused claim forms to be delivered by <u>U.S. Mail</u> to Plaintiff for the purpose of executing such scheme. |
| 33.       Each and every one of the false medical insurance claims submitted by or at the direction of Defendants in connection with the fraudulent scheme described herein is an indictable offense <u>under 18 U.S.C. §1341 (relating to mail fraud) or 18 U.S.C. §1343 (relating to wire fraud)</u> and thus is a predicate act under the RICO statute. | 33.       Each and every one of the false medical insurance claims submitted by or at the direction of Defendants in connection with the fraudulent scheme described herein is an indictable offense <u>under 18 U.S.C. §1341 (relating to mail fraud)</u> and thus is a predicate act under the RICO statute. |

As the above table shows, HealthGuard's amended mail fraud allegations are virtually

unchanged from the original complaint.  They remain conclusory and unsupported by any

allegations of fact elsewhere in the complaint.  Not one specific instance of the use of the mails

is pleaded.  <u>Bernstein v. Misk</u>, 948 F.Supp. 228, 238-239 (S.D.N.Y 1997) (conclusory,

boilerplate allegation that defendants used the mails in violation of §1341 was insufficient where

the remainder of the complaint was "wholly barren of any reference to use of the mails.").

The following table compares the continuity allegations in the original complaint with the corresponding allegations in the amended complaint.

| ORIGINAL COMPLAINT | AMENDED COMPLAINT |
|---|---|
| 17.    Plaintiff stopped approving payments for services performed at Greenfield in October of 2000 based on MLM's <u>inappropriate</u> billing practices on behalf of Greenfield. | 17.    Plaintiff stopped approving payments for services performed at Greenfield in October of 2000 based on MLM's <u>fraudulent</u> billing practices on behalf of Greenfield. |
| 34.    Each Defendant engaged in more than two predicate acts in a ten year period. Defendants' repeated acts of mail and/or wire fraud establish a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(1) and (5). | 34.    Each Defendant engaged in more than two predicate acts in a ten year period. Defendants' repeated acts of mail and/or wire fraud establish a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(1) and (5).  . . . <u>The predicate acts of mail fraud were "continuous" because they establish conduct that by its nature projects into the future with a threat of repetition (i.e. there was no natural ending point for the scheme, it would have continued indefinitely unless and until the fraudulent acts were discovered).  Related and repeated predicate acts that form the regular way of doing business of an enterprise establish a "pattern of racketeering conduct within the meaning of 18 U.S.C. §1961(5) and the rules announced in the cases in this Circuit interpreting the statutory provisions.  See Tabas v. Tabas, 47 F.3d 1280, 1292-93 (3d Cir. 1995) (en banc)</u>. |

In paragraph 17 of the Amended Complaint, HealthGuard alleges that it stopped payments to Greenfield and Premier in October of 2000.  Greenfield was incorporated on April 20, 1999.  (See Exhibit M, Dep. Ex. #2, "Consent of the Incorporator")  Thus, any alleged pattern of predicate acts would have lasted at most seventeen months.

However, HealthGuard fails to allege any specific predicate acts or any specific dates for any predicate acts during this seventeen month period.  The dates shown in Exhibit A to the Amended Complaint are dates when Greenfield or Premier rendered medical or chiropractic services, not the dates of alleged predicate acts of mail fraud.  Thus, HealthGuard's Amended

Complaint fails to allege a closed-ended pattern. Apparently conceding this point, HealthGuard

alleges an open-ended pattern in paragraph 34. However, the only basis for HealthGuard's

allegation of a threat that defendants would continue to commit predicate acts in the future is

HealthGuard's assertion that "the scheme … would have continued indefinitely" but for the fact

that HealthGuard discovered it. In fact, there is no such threat, because Greenfield and Premier,

the companies whose bills are at issue in this case, are both out of business.

### B.    The RICO Case Statement

HealthGuard filed its RICO Case Statement on December 24, 2002. A copy of the RICO

Case Statement is attached as Exhibit B. In Part A of the RICO Case Statement (Exhibit B, page

1), HealthGuard was required to state the alleged misconduct and basis of liability as to each

defendant in each RICO count. At pages 2, 5 and 7 of the RICO Case Statement, HealthGuard

stated identically that defendants Mark Gartenberg, Steve Gartenberg and Mark Tischler:

> (4) directed the employees of Greenfield and Premier to perform medically
> inappropriate (see entry "A" on the attached False Claims Chart) and medically
> unnecessary (see entry "B" on the False Claims Chart) services upon patients;

> (5) directed the employees of Greenfield and Premier to document for billing
> purposes services that were never rendered (see entry "C"), services that were
> different and more costly than services actually rendered, as well as services that
> were not medically necessary or appropriate.

> (7) directed employees of MLM to submit false medical insurance claims
> (identified with particularity in the False Claims Chart) via U.S. mail to Plaintiff
> for payment, knowing such claims to be fraudulent.

The "False Claims Chart" can be found at Exhibit A to the Amended Complaint. On

page 1 of 62 is a single asterisked item labeled "medically unnecessary." On page 6 of 62 is a

single asterisked item labeled "medically inappropriate." On page 50 of 62 is a single asterisked

item labeled "never performed." None of these examples is supported by any factual

explanation. Moreover, there are no asterisked examples of claims for services that were not

rendered or that were different and more costly than the services actually rendered. Most important of all, HealthGuard failed to relate any of the asterisked items to a specific use of the mails in its RICO Case Statement.

At pages 3, 6 and 8 of the RICO Case Statement, HealthGuard stated that the submission of false medical insurance claims continued for a period of twenty-six months. Again, HealthGuard failed to provide the beginning and ending dates of the alleged period and failed to provide specific instances of the use of the mails during such period.

In Part B of the RICO Case Statement (Exhibit B, page 9), HealthGuard was required to list each predicate act constituting the alleged RICO violation, "including such specifics as names, dates and types of communications or acts." HealthGuard provided only a vague and general description of the use of the mails to transmit allegedly false insurance claims. HealthGuard failed to provide any specific facts at all. (Exhibit B, page 10).

## V.    REVIEW OF THE EVIDENCE

### A.    HealthGuard's Answers to Defendants' First Set of Interrogatories

On January 13, 2003, HealthGuard answered defendants' first set of interrogatories. A copy of HealthGuard's answers to defendants' first set of interrogatories is attached as Exhibit C. Interrogatory No. 2 asked HealthGuard to "state the facts on which you base the allegations in paragraph 21" of the complaint. HealthGuard responded as follows:

> The allegations in paragraph 21 of the Amended Complaint are based on the review of certain patient files available to Plaintiff, including the treatment rendered and the claims billed, as well as, interviews with employees of the defendants. The individuals are identified in the Plaintiff's answer to Interrogatory No. 4. By way of further response, please refer to the documents available for inspection in the offices of Hartmann, Underhill & Brubaker LLP, 221 East Chestnut Street, Lancaster, Pennsylvania and the external audits attached as Exhibit A.

493176

Interrogatory No. 3 asked HealthGuard to "state the facts on which you base the allegations in paragraph 22" of the complaint.  Paragraph 22 alleged that defendants caused claim forms to be delivered to the plaintiff via U.S. Mail.  HealthGuard's response was as follows:

> The allegations in paragraph 22 of the Amended Complaint are based on representations made by employees of the Defendants, certain patient files available to Plaintiff and the Plaintiff's claim records.  By way of further response, please refer to the documents available for inspection in the offices of Hartmann, Underhill & Brubaker LLP, 221 East Chestnut Street, Lancaster, Pennsylvania.

Neither of the quoted answers specifies the insurance claims believed to be fraudulent, or the specific facts on which the allegations of fraud are based.  Neither answer relates any allegedly fraudulent insurance claim to a specific use of the mails.  Likewise, none of the documents produced by HealthGuard specifies the insurance claims believed to be fraudulent, or the specific facts on which the allegations of fraud are based.

**B.    HealthGuard's Answers to Defendants' Second Set of Interrogatories**

On May 22, 2003, HealthGuard answered defendants' second set of interrogatories.  A copy of HealthGuard's answers to defendants' second set of interrogatories is attached as Exhibit D.  Interrogatories 13, 14, 15, and 16 respectively asked HealthGuard to identify by patient name, date of treatment, type of service, and amount paid, every procedure which HealthGuard claims to be: (a) medically inappropriate; (b) medically unnecessary; (c) never rendered; or (d) different from the service actually rendered.  HealthGuard provided the same response to each interrogatory as follows:

> Plaintiff has identified an example of a procedure rendered by the Defendants which was medically inappropriate on the False Claims Chart attached as Exhibit A to Plaintiff's Amended Complaint.  By way of further response, Plaintiff's investigation and discovery into each procedure identified in patient records

recently produced by several defendants is ongoing.  Plaintiff will supplement this
response as additional information becomes available.

HealthGuard has not supplemented its responses.  Thus, the only "fraudulent" claims

HealthGuard has identified are the three procedures which it identified in Exhibit A to its

Amended Complaint, as follows:

> a. Patient No. 180322329.02 – payment for "temperature gradient" rendered on
> 9/13/99 in the amount of $42.28 (allegedly medically unnecessary).
>
> b. Patient No. 484768869.02 – payment for "nerve conduct veloci" rendered on
> 5/22/00 in the amount of $285.60 (allegedly medically inappropriate).
>
> c. Patient No. 55330686.02 – payment for "physical medice tr" rendered on
> 1/7/00 in the amount of $13.21 (allegedly never performed).

(See pages 1, 6 and 50 of Exhibit A to HealthGuard's Amended Complaint).

Once again, HealthGuard fails to relate even these three procedures to a specific use of

the mails.  Moreover, all three procedures were performed within a nine month period and thus

are not of sufficient duration to constitute a pattern of racketeering.  Finally, three procedures

costing less than $350 altogether hardly amount to a scheme to defraud.

### C.    Defendants' Pleadings and Answers to Interrogatories

### 1.    Mark Tischler

In his Answer to the Amended Complaint, Mark Tischler stated that he did not control or

operate MLM; that Steve Gartenberg owns and controls MLM; that MLM did not provide

management services to Greenfield or Premier.  (Exhibit E, ¶13).  He further stated that he was

not associated with MLM as an owner, officer or person directing MLM's day-to-day operations;

and that Greenfield and Premier were not associated with MLM as owners, officers or persons

directing MLM's day-to-day operations.  (Exhibit E, ¶32).  He admitted that he was involved in

the management of Greenfield.  (Exhibit E, ¶15).

Mark Tischler further stated that neither MLM, nor Steve Gartenberg, nor Mark Gartenberg submitted any of the claims identified in Exhibit A to the Amended Complaint or made any representations to HealthGuard.  (Exhibit E, ¶¶40, 47 and 53).  He denied that Greenfield and Premier submitted medical insurance claims to HealthGuard via U.S. mail or that such claims were false.  (Exhibit E, ¶36).

In his answers to Interrogatories, Mark Tischler stated that he was the a director, officer and sole shareholder of Advantage Chiropractic Center from 1992 to 1997; Greenfield Chiropractic Center from 1997 to 1999; and Bala Medical Management from 1999 to 2002.  He stated that all three entities are now inactive.  (Exhibit F, page 2, ¶¶4, 5, 7 and 8).  Note that Greenfield Chiropractic Center and Greenfield Sports Medicine and Rehab, P.C. are separate corporations.

### 2.    Greenfield

In its Answer to the Amended Complaint, Greenfield stated that it no longer operates and has no place of business.  (Exhibit G, ¶10).  Greenfield further stated that MLM did not provide management services to Greenfield.  (Exhibit G, ¶13).  Greenfield stated that it was not associated with MLM as an owner, officer or person directing MLM's day-to-day operations (Exhibit G, ¶32).  Greenfield admitted that Mark Tischler was involved in the management of Greenfield.  (Exhibit G, ¶15).

Greenfield further stated that neither MLM, nor Steve Gartenberg, nor Mark Gartenberg submitted any of the claims identified in Exhibit A to the Amended Complaint or made any representations to HealthGuard.  (Exhibit G, ¶¶40, 47 and 53).  Greenfield denied that it submitted medical insurance claims to HealthGuard via U.S. mail or that such claims were false. (Exhibit G, ¶36).

### 3.    Premier

In its Answer to the Amended Complaint, Premier stated that it no longer operates and has no place of business.  (Exhibit H, ¶11).  Premier further stated that MLM did not provide management services to Premier.  (Exhibit H, ¶13).  Premier stated that it was not associated with MLM as an owner, officer or person directing MLM's day-to-day operations (Exhibit H, ¶32).  Premier admitted that Mark Tischler was involved in the management of Premier. (Exhibit H, ¶15).

Premier further stated that neither MLM, nor Steve Gartenberg, nor Mark Gartenberg submitted any of the claims identified in Exhibit A to the Amended Complaint or made any representations to HealthGuard.  (Exhibit H, ¶¶40, 47 and 53).  Premier denied that it submitted medical insurance claims to HealthGuard via U.S. mail or that such claims were false.  (Exhibit H, ¶36).

### 4.    Steve Gartenberg, Mark Gartenberg and MLM

In their Answer to the Amended Complaint, Steve Gartenberg, Mark Gartenberg and MLM admitted that MLM is owned and controlled by Steven Gartenberg and that Mark Gartenberg was involved in the management of MLM.  They stated that Mark Tischler did not control or operate MLM; that MLM provided management services to various medical practices in Pennsylvania and New Jersey; but that MLM did not provide management services to Greenfield or Premier.  (Exhibit I, ¶13).  The Gartenbergs and MLM admitted that Steve Gartenberg is the sole shareholder and officer of MLM and that Mark Gartenberg was an employee of MLM.  They further stated that Mark Tischler, Greenfield and Premier were not associated with MLM as owners, officers or persons directing MLM's day-to-day operations. (Exhibit I ¶32).

Steve Gartenberg and Mark Gartenberg stated that they did not cause David Raab, M.D. to incorporate Greenfield as a professional corporation, or cause Leilani Gyenning, M.C. to incorporate Premier as a professional corporation.  (Exhibit I, ¶¶16 and 19).  The Gartenbergs and MLM further stated that neither MLM, nor Steve Gartenberg, nor Mark Gartenberg made any representations, or caused any representations to be made, to HealthGuard concerning claims for medical services rendered by Greenfield or Premier.  (Exhibit I, ¶¶40, 47 and 53).

In his answers to Interrogatories, Steve Gartenberg stated that he has been the sole shareholder, director and officer of Main Line Medical since its incorporation in December 1998, and the sole shareholder, director and officer of CMS, Inc. since its incorporation in April of 1995.  (Exhibit J, pages 3-4, ¶¶4, 5 and 6).  He admitted that CMS, Inc. conducted telemarketing for Greenfield.  (Exhibit J, page 5, ¶8).  However, he stated that he is not and never was a shareholder, director, officer or employee of Greenfield Sports or Premier Sports.  (Exhibit J, pages 3-4, ¶¶4, 5 and 6).  He further stated that he is not a shareholder of any corporate entity that provided the medical or chiropractic services or that submitted the bills that HealthGuard is challenging in this case.  (Exhibit J, page 4, ¶7).  In his answers to Document Requests, Steve Gartenberg stated that he is not a party to any shareholder agreements involving MLM, CMS, Inc., Greenfield or Premier, and that he has not treated any patients on behalf of MLM, Greenfield or Premier.  (Exhibit J, pages 5 and 6, ¶¶2 and 3).

Mark Gartenberg, in his answers to Interrogatories stated that he has not served as a director or officer of MLM, CMS, Inc., Greenfield or Premier.  (Exhibit K, page 3, ¶¶4 and 5).  He stated that he has been an employee of MLM and CMS, Inc., but not of Greenfield or Premier.  (Exhibit K, page 4, ¶6).  He stated that he is not a shareholder of any corporate entity that provided the medical or chiropractic services or that submitted the bills that HealthGuard is

challenging in this case. (Exhibit K, page 4, ¶7). In his answers to Document Requests, Mark Gartenberg stated that he is not a party to any shareholder agreements involving MLM, CMS, Inc., Greenfield or Premier, and that he has not treated any patients on behalf of MLM, Greenfield or Premier. (Exhibit K, pages 5 and 6, ¶¶2 and 3).

MLM, in its answers to Interrogatories, stated that is was incorporated by Steve Gartenberg, who is its sole director and officer. (Exhibit L, pages 2 and 3, ¶¶2, 4, 5). MLM further stated that did not have any written or oral management, marketing, consulting or similar agreements with Mark Tischler, Greenfield, or Premier. (Exhibit L, pages 3 and 4, ¶7). Main Line admitted that it did make a clerical employee available to Bala Medical Management, Inc. ("Bala Medical"). Bala Medical compensated and supervised the employee in her work for them. (Exhibit L, pages 3 and 4, ¶7). MLM stated that it did not submit claims to HealthGuard in order to receive payment for services rendered to patients insured by HealthGuard. (Exhibit L, page 4, ¶8). In its answers to document requests, MLM stated that its books of account do not record any transactions with Mark Tischler, Greenfield, or Premier; its minutes do not record any transactions with Mark Tischler, Greenfield or Premier; and Main Line Medical has no patients and has no patient records for patients of Greenfield or Premier. (Exhibit L, pages 8 and 9, ¶¶4, 5, 6).

### 5.    Deposition of Dr. David Raab

Dr. David Raab was the physician in charge at Greenfield during the period covered by the complaint. He was deposed on August 20, 2003. A copy of his deposition is attached hereto as Exhibit M.

The first half of Dr. Raab's deposition (Exhibit M, pages 1-93) focused on his employment and duties at Greenfield. Dr. Raab testified, inter alia, that there was a management

services agreement between Greenfield and Bala Medical Management, Inc., which Dr. Raab signed on behalf of Greenfield and Mark Tischler signed on behalf of Bala Medical. (Exhibit M, p. 10-11) He was hired as the medical director to make all medical decisions. (Exhibit M, p. 11-12) As such, he saw the patients, incorporated their care plans, and supervised Greenfield employees in carrying out his orders. (Exhibit M, p. 15-17 and Dep. Ex. #7) The patients sought treatment for physical problems and pain, not for accident related injuries. (Exhibit M, p. 18) Bills were prepared from the patient charts and were sent by computer to an office in Philadelphia or Bala Cynwyd. (Exhibit M, p. 21) In reviewing letters that he signed, explaining the need for various treatments and tests that had been questioned by insurers, Dr. Raab testified that he agreed with the letters when he signed them and believed them to be true. (Exhibit M, pp. 23-55) He testified that he did not recommend testing unless he felt it was appropriate. (Exhibit M, p. 44, 49) He also testified that he never had occasion to advise an insurer that a particular procedure was in fact unnecessary or unauthorized. (Exhibit M, p. 57-58) Dr. Raab would speak to Mark Tischler when he wanted to take a day off or when he wanted supplies. (Exhibit M, p. 61). Dr. Raab resigned in November of 2000, at which time he told Mark Tischler for the first time that certain tests were unnecessary and did not contribute to the treatment. (Exhibit M, pp. 63-64) He testified that he got the impression that the Gartenbergs controlled Greenfield from an FBI agent who interviewed him. (Exhibit M, p. 70) He testified that Mark Tischler was often on the phone with the office of Bala Medical Management, Inc. (Exhibit M, p. 70-71) He met with Mark Gartenberg regarding employment with Greenfield. He never spoke with Mark Gartenberg or Steve Gartenberg after that. Neither Steve Gartenberg nor Mark Gartenberg supervised him or gave him instructions. (Exhibit M, p. 74-75) He thought there was a relationship between Mark Gartenberg and Bala Medical, but he did not know what it was.

493176

(Exhibit M, p. 75-76)  He did not know the basis for the allegations in the complaint that the Gartenbergs and Mark Tischler controlled Greenfield through MLM; that the Gartenbergs and Mark Tischler set standardized protocols for treating patients at Greenfield; or that the Gartenbergs and Mark Tischler directed Greenfield employees to perform unnecessary or inappropriate medical services and to bill for services that were not rendered or were different from and more costly than the services that were actually rendered.  (Exhibit M, p. 76-78).

The second half of Dr. Raab's deposition (Exhibit M, pages 93-154) focused on a review of patient charts.  Dr. Raab testified that he was the medical director at Greenfield; that he performed a physical examination for each patient and prepared a treatment plan; that he ordered initial diagnostic tests and follow up diagnostic tests in some cases and not in others; that it was his decision whether to order tests and, if so, what tests to order (including x-ray, ultrasound, neurometer, and nerve pace); that he considered the tests appropriate when he ordered them; that he read and interpreted the tests results; that he followed up on each patient's progress and noted if they were improving or not; that he performed all trigger point injections; that he was present at the facility when the patients received their chiropractic treatments and physical therapy; that treatment was in fact provided as noted in the patient charts; that he believed the medical treatments had therapeutic value; that the tests had diagnostic value; and that the chiropractic treatments and physical therapy had therapeutic value.  (Exhibit M, at pages 93-154).

## VI.    ARGUMENT

### A.    Plaintiff Has Failed To Establish The "Enterprise" Element

#### 1.    Plaintiff Has Failed to Substantiate Racketeering Activity Committed in the Conduct of the Affairs of the MLM Enterprise.

It is axiomatic that a RICO plaintiff may only recover for harm caused by an actual

violation of RICO.  Beck v. Prupis, 120 S. Ct. 1608 (2000).  Here the alleged racketeering

activity is mail and wire fraud perpetrated through Defendant's operation of the MLM enterprise.

However, it is similarly axiomatic that a hypothetical scheme to defraud, not committed through

the operation of an enterprise (separate from the actors) does not fall within §1962(c).  Gasoline

Sales, Inc. v. Aero Oil Co., 39 F. 3d 70, 72-73 (3d Cir. 1994); Glessner v. Kenny, 952 F. 2d 702

(3d Cir. 1991); and see Item c(v) of Exhibit B, the RICO Case Statement.

Although Plaintiff has alleged that MLM was "the vehicle by which Defendants centrally

coordinated a large-scale pattern of fraudulent activity," that it billed for all of the services and

received all payments billed on behalf of Greenfield and Premier, and that paid the expenses of

those practices and retained the cash left over, none of this is true or supported by the evidence.

See Exhibit B, RICO Case Statement at p. 12.

The evidence indicates that Greenfield and Premier neither operated through MLM nor

were controlled by MLM.  Each was a free-standing entity, nominally owned by Dr. Raab and

Dr. Geyening, respectively, and actually controlled by Mark Tischler.  Accounting and billing

services for the practices were provided by a non-party, Bala Medical Services, Inc. ("Bala") a

company operated and solely owned by Mark Tischler.  Bala, not MLM, submitted bills to

HealthGuard.  And the payments made by HealthGuard were made not to MLM but directly to

Greenfield.[1]  MLM did <u>not</u> pay Greenfield's expenses; Greenfield paid its own expenses.  Nor did MLM retain and distribute to its owners the cash left over from Greenfield's operations.  To the extent that there were any profits, the money was paid out to Tischler alone.

Just as MLM was uninvolved in the Greenfield/Tischler operation, so were Tischler and his entities divorced from MLM's operations.  Contrary to plaintiff's allegation, Tischler was not an officer, owner, or participant in the affairs of MLM.  Greenfield and Premier had no interest in or affiliation with MLM.

Thus, even if HealthGuard were defrauded out of every cent that it paid, none of this occurred through Defendants' operation of the MLM enterprise.  Simply put, the RICO acts which Plaintiff has alleged – *i.e.* Defendants' participation in the conduct of MLM's affairs through a pattern of racketeering activity – are utterly without foundation.

**2.    Plaintiff Has Failed to Demonstrate that Tischler, Greenfield, or Premier Participated in the Conduct of the Affairs of MLM.**

Since Plaintiff has so inaccurately pled a relationship between the Greenfield/Premier/ Tischler entity and MLM, it is not surprising that it cannot factually link those Defendants to the alleged MLM enterprise.  This factual link is essential inasmuch as RICO liability depends upon a defendant's participation in the operation or management of the alleged racketeering enterprise.  <u>Reeves v. Ernst & Young</u>, 507 U.S. 170 (1993).

MLM is owned and operated solely by the Gartenbergs.  Tischler was not an owner, officer, employee, or associate in MLM.  Nor does the record suggest any participation in the operation or management of that entity.  Plaintiff has attempted to suggest a relationship from the

---

[1]  Premier was an operating entity for only a few months before retaking the Greenfield name.  It was equally unrelated to MLM and never received any payments from HealthGuard.

fact that Tischler is the son-in-law of Mark Gartenberg and brother-in-law of Steven Gartenberg, but familial relationship is not a basis for RICO liability.

As to Greenfield and Premier, Plaintiff does not even allege that those entities participated in the operation of MLM. To the contrary, the Complaint alleges, incorrectly, that MLM controlled the operation of Greenfield and Premier. This reverse-control scenario fails to make out a violation of § 1962(c), because it violates the requirement that the "persons" and the "enterprise" be distinct.

### 3.    Plaintiff Has Failed to Tie Either Mark Gartenberg or Steven Gartenberg to the Alleged Scheme.

It follows from the above-described deficiencies that Plaintiff has also been unable to tie either of the Gartenbergs to the operation of the alleged Greenfield/Premier billing scheme. It was Tischler who clearly controlled both the business operation of the clinics and of their billing agency, Bala Medical Services, Inc. Dr. Raab's unequivocal testimony was that Tischler managed the client. (See Exhibit M, Raab Dep. pp. 11, 61, 63, 71). Dr. Raab, the medical director, pointed to no participation by either of the Gartenbergs; he was not supervised by Steve Gartenberg or Mark Gartenberg; and he never spoke to either of them after he started working at Greenfield (Exhibit M, Raab Dep. p. 75-76). Other than family relationship and similarity of business, Plaintiff has not offered any evidence that the Gartenbergs were involved in Greenfield's alleged defrauding of HealthGuard.

### B.    Plaintiff Has Failed To Establish A Pattern Of Racketeering Activity.

A civil RICO claim requires that Plaintiff demonstrate a pattern of racketeering activity, 18 U.S.C. 1962(c). The required pattern is demonstrated by showing both "relatedness" and continuity. H.J., Inc. v. Northwestern Bell Tele. Co., 492 U.S. 229 (1989), Kehr Packages, Inc. v. Fidelcor, Inc., 926 F. 2d 1406, 1411-1412 (3d Cir. 1991).

Though "relatedness" is not disputed in this motion, Defendants submit that Plaintiff has failed to demonstrate continuity.  Plaintiff has alleged a single-victim, single-scheme episode which began with the incorporation of Greenfield on April 20, 1999, and terminated in October of 2000, when HealthGuard ceased paying Greenfield's invoices.

Recognizing that such short-term, limited activity would fail as a "closed-ended" pattern, see Tabas v. Tabas, 47 F. 3d 1280, 1292 (3d Cir. 1995), Plaintiff has specifically pleaded an "open-ended" form of continuity.  (*RICO Case Statement p. 19*.)[2]  In order to align its pleading with the definition of an "open-ended" conspiracy, Plaintiff has alleged that the limited conduct poses an ongoing threat of continued criminality.  However, this bold assertion is totally belied by the facts.  Both Greenfield and Premier are out of business.

In February of 2001, 15 months before Plaintiff filed its initial complaint, Greenfield ceased operation.  (Premier had previously ceased operation.)  Tischler has not opened up any similar facility and has, in fact, given up his chiropractic license.  Thus, by the time of Plaintiff's allegation of threatened future harm contained in its RICO Case Statement filed in December 2002, the entire operation had been defunct for almost two years.

Even more basically, Plaintiff has yet to allege or produce any specific predicate acts constituting a pattern of racketeering activity.  While two or more specific acts may not be sufficient to establish a pattern, they are most certainly necessary to the claim.  As shown above, Plaintiff has identified only three specific claims out of more than 3,500 claims listed on the so-called Fraudulent Claims Chart.  Even though HealthGuard alleges that those three claims were

---

[2] It is doubtful whether a 17-month, single-victim scheme could qualify as a "closed-ended" pattern.  In *Hughes v. Consol-Pennsylvania Coal Co., 945 F. 2d 594, 610-611 (3d Cir. 1991)* the Court rejected a 12-month scheme which involved numerous victims.

either medically unnecessary, inappropriate, or not performed, it has set forth no factual basis for the allegation.

Nor has Plaintiff related the three claims, or any activity by the Defendants, to a use of the mails or interstate wire. Plaintiff has never specified any particular use of mail or wire, nor alleged any date thereof, nor persons who caused any specific mailing. Obviously, it is the specific use of mail (or wire) which constitutes mail (or wire) fraud, United States v. Tarnapol, 561 F. 2d 466, 475 (3d Cir. 1977) and which, in turn, is requisite to a RICO mail fraud case, Annulli v. Panilear, 200 F. 3d 189, 200 (3d Cir. 1999).

### C.    Plaintiff Has Failed To Establish A Scheme To Defraud.

Plaintiff has also failed to produce any evidence supporting its allegation of a scheme to defraud. Without proof of such a scheme, there can obviously be no mail or wire fraud even if the use of those instrumentalities had been shown. United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994).

The evidence indicates that Greenfield, under the direction of Dr. Raab, treated patients and then submitted bills, through Bala Medical Services, Inc., to HealthGuard.

Dr. Raab was the Medical Director throughout the entire period in which any invoices were paid by HealthGuard. Plaintiff has not sued Dr. Raab and has not alleged that he was part of any scheme to defraud. However, Dr. Raab clearly testified that he directed the medical operation at Greenfield. In his deposition, Dr. Raab testified that he was the medical director at Greenfield; that he performed a physical examination for each patient and prepared a treatment plan; that he ordered initial diagnostic tests and follow up diagnostic tests in some cases and not in others; that it was his decision whether to order tests and, if so, what tests to order (including x-ray, ultrasound, neurometer, and nerve pace); that he considered the tests appropriate when he

ordered them; that he read the interpreted the tests results; that he followed up on each patient's progress and noted if they were improving or not; that he performed all trigger point injections; that he was present at the facility when the patients received their chiropractic treatments and physical therapy; that treatment was in fact provided as noted in the patient charts; that he believed the medical treatments had therapeutic value; that the tests had diagnostic value; and that the chiropractic treatments and physical therapy had therapeutic value.  (Exhibit M, pp. 93-154).[3]

Based on Dr. Raab's factual testimony, there is no evidentiary support for HealthGuard's allegations that Defendants directed Greenfield employees to perform medically inappropriate and medically unnecessary services, or directed Greenfield employees to bill for services that were never rendered, or directed Greenfield employees to knowingly submit fraudulent insurance claims.  (See Part V.C.5 above.)

Defendants have repeatedly demanded to know which specific charges Plaintiff contends to be fraudulent.  Plaintiff's expert has questioned the efficacy of certain tests, and the appropriateness of individual treatment plans, and has suggested that the records sometimes fail to indicate whether certain procedures were performed by a physician – a question which Dr. Raab has since answered.  However, as to any specific contentions of fraud, Plaintiff has never gone beyond the three items, totaling $341.09, discussed above and has never supported the contention that even those items were the product of a scheme to defraud.

It is respectfully suggested that Plaintiff's evidentiary failings point out the need for summary judgment in this case.  If Defendants were required to go to trial in this matter, they

---

[3] It is interesting to note that Dr. Raab testified that other carriers would periodically question certain billings and procedures, that he would respond to such inquiries, and that the matter would then be adjusted.  However, no such inquiries or complaints were ever received from HealthGuard.  (Dr. Raab Dep. p. ____.)

would have no idea how Plaintiff intends to prove the alleged scheme to defraud. Which specific charges were for inappropriate services? Why were those services inappropriate? Which charges were for unnecessary services? Why were those services unnecessary? Will Plaintiff really contend that some services were never performed? Which payments were the result of a fraudulent scheme? Who organized the scheme and who participated in it? Plaintiff's failure to supply evidence in response to these questions impairs the Defendants' ability to deal with and disprove Plaintiff's fraud allegations. Fortunately, it also entitles Defendants to summary judgment.

### D.     Judgment Should Be Entered Against HealthGuard on its §1962(d) Claim

To present a cognizable claim for a §1962(d) conspiracy to violate §1962(a), (b), or (c), HealthGuard must allege and prove:

1.     that defendants agreed with one or more other persons to participate in and facilitate a scheme to violate §1962(a), (b) or (c), <u>Rehkop v. Berwick Healthcare Corp.</u>, 95 F.3d 285, 290 (3d Cir. 1996); <u>Salinas v. U.S.</u>, 522 U.S. 52, 118 S.Ct. 469, 476-478 (1997); *and*

2.     that the scheme involved the actual or intended commission of predicate acts of racketeering activity by one or more of the conspirators, <u>Salinas</u>, <u>supra</u>, 118 S.Ct. at 477; <u>U.S. v. Adams</u>, 759 F.2d 1099, 1116 (3d Cir. 1985); *and*

3.     that the actual or intended acts of racketeering activity did form or would have formed a pattern, defined as two or more related acts of racketeering activity posing a substantial threat of continued *criminal* activity, <u>Rehkop</u>, <u>supra</u>, 95 F.3d at 290; <u>Salinas</u>, <u>supra</u>, 118 S.Ct. at 477; <u>H.J., Inc. v. Northwestern Bell Telephone Co.</u>, 492 U.S. 229, 239 (1989); *and*

493176

4.      that the conspirators:

(a)      actually invested, or were going to invest, money derived from the pattern

of racketeering activity in an enterprise affecting interstate or foreign

commerce, 18 U.S.C. §1962(a); <u>Dow Chemical Co. v. Exxon Corp.</u>, 30

F.Supp 2d 673, 697 (D. Del. 1998); or

(b)      actually acquired or maintained, or were going to acquire or maintain, an

interest in or control of such an enterprise through a pattern of

racketeering activity, 18 U.S.C. §1962(b); <u>Dow Chemical</u>, <u>supra</u>, 30

F.Supp. 2d at 698; or

(c)      actually conducted or participated in conducting, or were going to conduct

or participate in conducting, the affairs of such an enterprise through a

pattern of racketeering activity, 18 U.S.C. §1962(c); <u>Dow Chemical</u>,

<u>supra</u>, 30 F.Supp. 2d at 699-701; *and*

5.      that plaintiff's injuries were caused by an overt act in furtherance of the

conspiracy, <u>Beck v. Prupis</u>, 529 U.S. 494, 505-506 (2000); *and*

6.      that the overt act was itself an act of racketeering as defined in 18 U.S.C.

§1961(1); <u>Beck v. Prupis</u>, <u>supra</u>, 529 U.S. at 505-506.

In <u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153, 1191 (3d Cir. 1993), the Court of

Appeals stated that "[a]ny claim under §1962(d) based on a conspiracy to violate the other

subsections of §1962 necessarily must fail if the substantive claims are themselves deficient."

As shown above HealthGuard has not properly alleged, and the discovery responses and

deposition testimony doe not show, the existence of predicate acts of mail fraud constituting a

pattern of racketeering activity.  Since HealthGuard's substantive claim under §1962(c) is

deficient, judgment should be entered against HealthGuard on its claim under §1962(d).

**E.    Judgment Should Be Entered Against HealthGuard on its State Fraud Claims**

Count II of HealthGuard's Amended Complaint is based on 18 Pa.C.S. §4117.  Count III

is based on common law fraud.  The pleadings and the discovery responses do not show the

existence of a scheme to defraud HealthGuard.  As discussed above, the deposition testimony of

Dr. Raab contravenes HealthGuard's allegations that defendants directed Greenfield employees

to perform medically inappropriate and medically unnecessary services, or directed Greenfield

employees to bill for services that were never rendered, or directed Greenfield employees to

knowingly submit fraudulent insurance claims.  (See Part V.C.5, above)  Thus, there can be no

genuine dispute that defendants did <u>not</u> knowingly submit false claims to HealthGuard.

Accordingly, defendants are entitled to summary judgment on HealthGuard's state law claims.

**F.    The Court Should Not Exercise Supplemental Jurisdiction Over Plaintiffs' State Law Claims.**

A district court may decline to exercise supplemental jurisdiction over a state claim if:

> (2)    the claim substantially predominates over the claim or claims over which
>
> the district court has original jurisdiction, [or]

> (3)    the district court has dismissed all claims over which it has original
>
> jurisdiction ...

28 U.S.C. §1367 (c); <u>Growth Horizons, Inc. v. Delaware County, PA</u>, 983 F.2d, 1277, 1284-5.

"In making its determination, the district court should take into account generally

accepted principles of "judicial economy, convenience, and fairness to the litigants.""  <u>Growth</u>

<u>Horizons</u>, <u>supra</u>, 983 F.2d at 1284 (quoting <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726,

86 S.Ct. 1130, 1139 (1966)).  Furthermore, "the district court should consider whether the litigation is in a relatively early stage, whether either party will be prejudiced by dismissal of the state law claims and whether the state law claims involve issues of federal policy."  Glaziers and Glassworkers Union Local 252 v. Newbridge Securities, Inc., 823 F.Supp. 1191, 1197 (E.D. Pa. 1993) (citing Imperiale v. Hahnemann Univ., 776 F.Supp. 189, 200 (E.D. Pa. 1991); David Sigel, Practice Commentary appended to 28 U.S.C. §1367).

The Court should dismiss the HealthGuard's state law claims because HealthGuard's federal claims fail to state claims upon which relief can be granted.  "Courts should ordinarily decline to exercise supplemental jurisdiction over state law claims when the federal claims are dismissed."  Kis v. County of Schuylkill, 866 F.Supp. 1462, 1480 (E.D. Pa. 1994) (citing United Mine Workers v. Gibbs, 383 U.S. 715, 626, 86 S. Ct. 1130, 1139, 166 L.Ed. 2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.")); Litz v. City of Allentown, 896 F. Supp. 1401, 1414 (E.D. Pa. 1996); Flickinger v. Wancyk, 843 F.Supp. 32, 37 (E.D. Pa. 1994).  Moreover, HealthGuard will not be prejudiced in any way by dismissal of its state law claims, as it faces no impediments to pursuing those claims in state court.  Accordingly, this Court should decline to exercise supplemental jurisdiction over plaintiff's state claims.

**VII.    CONCLUSION**

For all the foregoing reasons, defendants respectfully request that the Court enter summary judgment in their favor and against HealthGuard on all counts of the Amended Complaint.

JOHN W. MORRIS, Attorney at Law.

_____

John W. Morris, Esq.
1525 Locust Street, 17th Floor
Philadelphia, PA  19102
215-772-2290

Attorney for Defendants Mark Tischler, Greenfield Sports Medicine & Rehab, P.C., and Premier Sports Medicine & Rehab, P.C.

OBERMAYER REBMANN MAXWELL & HIPPEL LLP

_____

Lawrence J. Tabas, Esquire
Richard P. Limburg, Esquire
One Penn Center – 19th floor
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103
215-665-3000

Attorneys for Defendants

Dated:  October 8, 2003

493176

## <u>CERTIFICATE OF SERVICE</u>

I, Richard P. Limburg, Esquire, hereby certify that on October 30, 2003, I caused the

foregoing document to be served via first class mail, postage prepaid, upon the following:

Robert M. Frankhouser, Esquire
Hartman Underhill & Brubaker LLP
221 E. Chestnut Street
Lancaster, PA  17602


John W. Morris, Esquire
1525 Locust Street, 17th floor
Philadelphia, PA  19102



_____
RICHARD P. LIMBURG

493176