IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION

| | | |
|---|---|---|
| HEALTHGUARD OF LANCASTER, INC., | : | |
|     HealthGuard | : | |
| | : | |
| v. | : | |
| | : | |
| MARK GARTENBERG; | : | No. 02-CV-2611 |
| STEVEN GARTENBERG; | : | |
| MARK TISCHLER; | : | |
| GREENFIELD SPORTS MEDICINE | : | |
| & REHAB, P.C.; | : | |
| PREMIER SPORTS MEDICINE | : | |
| & REHAB CENTER, P.C. and | : | |
| MAIN LINE MEDICAL SERVICES, INC. | : | |
|     Defendants | : | |

**RESPONSE OF PLAINTIFF HEALTHGUARD OF LANCASTER, INC. TO COURT'S ORDER OF DECEMBER 11, 2003**

I.    **DEFINITION OF AN ENTERPRISE**

A.    <u>Standard</u>

    An enterprise is statutorily defined as:

> . . . any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

18 U.S.C. § 1961(4). The enterprise in 18 U.S.C. § 1962(c) is properly viewed as the "vehicle through which the unlawful pattern of racketeering activity is committed ..." <u>Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc</u>., 46 F.3d 258 (3d Cir.1995). When officers and/or employees operate and manage a legitimate corporation, and use it to conduct a pattern of racketeering activity, those individuals are properly liable under RICO. <u>Id</u>. As such, Main Line Medical ("MLM") constituted an "enterprise" through which "persons," Mark Gartenberg, Steven Gartenberg, and Mark Tischler, acted. <u>Bonaritacola Electric Contractor, Inc. v. Boro Developers, Inc</u>., 2003 WL 329145 (E.D.Pa.2003).

B.  <u>Evidence</u>

In light of this authority, HealthGuard alleged that Mark Gartenberg, Steven Gartenberg, and Mark Tischler, in connection with one another and acting through MLM, conspired and did work in concert with Greenfield Sports Medicine & Rehab, P.C. ("Greenfield") (controlled or operated by David Raab, M.D.) and Premier Sports Medicine & Rehab Center, P.C. ("Premier") (controlled or operated by Leilani Gyening, M.D.) to generate false medical insurance claims which were submitted, via U.S. Mail, to HealthGuard for payment.

- Dr. Colditz, D.C., as an employee of Greenfield, has confirmed the nature and amount of control MLM and the individual Defendants maintained over Greenfield. See Affidavit of Craig W. Colditz, D.C., attached as Exhibit "A," pg. 2-3. It is anticipated that Dr. Colditz's testimony at trial will corroborate and elaborate upon his affidavit.

- Dr. Wallace, D.C., another employee of Greenfield, has also confirmed and substantiated the control MLM and the individual Defendants maintained over Greenfield. See Affidavit of Brian F. Wallace, D.C., attached as Exhibit "B," pg. 2-3. Likewise, it is anticipated that Dr. Wallace's testimony at trial will corroborate and elaborate upon his affidavit.

- The Employment Non-Solicitation Agreement ("Agreement") (attached as Exhibit "C") entered into by Dr. Raab when he was originally hired by Greenfield was signed by Steven Gartenberg, for the employer.

- Dr. Raab has indicated that the treatment plans for Greenfield's "patients" were created by Mark Tischler. See Deposition of Dr. Raab (Raab Deposition), portions of which are attached as Exhibit "D," pg. 21, lines 9-12. (A complete copy of Dr. Raab's deposition is attached to the Defendants' Motion as Exhibit M. The specific pages of the deposition relied upon in this Response are attached for the convenience of the Court.)

- Dr. Raab has also stated that it was his belief that billing information was forwarded by Dr. Colditz to Bala Cynwood. Raab Deposition, pg. 21, lines 19-21.

- Dr. Raab believed that Greenfield was a subsidiary of Bala or Mr. Gartenberg. Raab Deposition, pg. 75, lines 24-25.

- Dr. Raab also stated that he was unsure where MLM fit into the entire process other than it was the name at Bala. Raab Deposition, pg. 75, lines 24-25.

- Dr. Raab has indicated that Mark Tischler asked for his signature so that he (Tischler) could make a rubber stamp of the same. Raab Deposition, pg. 13, lines 20-22.

- Dr. Raab further stated that he gave his consent for Mark Tischler to use his signature stamp on the Greenfield checking account. Raab Deposition, pg. 14, lines 14-17.

## II.   CONSPIRACY

A.   <u>Standard</u>

To establish a claim of conspiracy, the evidence must address the period of conspiracy, the object of the conspiracy, and certain actions the alleged conspirators have taken to achieve that purpose. <u>Breslin v. Brainard</u>, 2003 WL 22351297 (E.D.Pa.2003); citing <u>Shearin v. E.F. Hutton Group, Inc</u>., 885 F.2d 1162 (3d Cir.1989).  A defendant may be held liable for conspiracy if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise. <u>Smith v. Berg</u>, 247 F.3d 532 (3d Cir.2001).

<u>Evidence</u>

To this end, HealthGuard has provided the following evidence to demonstrate that Mark Gartenberg, Steven Gartenberg and Mark Tischler, in their capacity as owners, officers, or controlling persons of MLM did conspire with Greenfield and Premier to repeatedly submit false medical insurance claims via U.S. Mail to HealthGuard, which practice continued for a period of twenty-six months, only ending after the conspiracy was discovered by HealthGuard.

- HealthGuard submits, in addition to the affidavits of both Dr. Wallace and Dr. Colditz, (which confirmed the conspiracy as alleged), an extensive Amended False Claims Chart (attached as Exhibit "E") outlining the false medical insurance claims and providing examples of claims that were not performed, were medically unnecessary, medically inappropriate or were for services conducted in the absence of any licensed physician.

- Dr. Gyening has submitted a letter directly to the Court, attached as Exhibit "F," indicating that Mark Tischler instructed her to incorporate the Premier practice and then, despite her explicit directions to the contrary, fraudulently used her name as the director of the practice despite the fact that she played no part in the management of the Premier.  HealthGuard anticipates that Dr. Gyening will provide testimony at trial consistent with her representations set forth in the above referenced letter.

- HealthGuard has provided the expert report of Dr. Shymansky who

>has concluded, upon a thorough review of the claims documentation submitted by Defendants for payment, that countless claims were submitted for services never performed, and that other claims were submitted for procedures that were excessive, inappropriate, identical to nearly every patient and constituted an overuse of diagnostic studies. See, Report of Dr. Shymansky, pages 15-16, attached as Exhibit "G."

As such, HealthGuard has provided sufficient evidence with regard to the period of conspiracy, object of the conspiracy, and those actions taken in furtherance of the conspiracy.

### III. PREDICATE ACTS

A. <u>Standard</u>

Each subsection of 18 U.S.C. § 1962 requires the existence of a pattern of racketeering activity. The statute defines a "pattern of racketeering activity" as requiring the commission of at least two predicate offenses, listed in 18 U.S.C. § 1961(1), within a ten year period. To prove mail fraud, plaintiff must demonstrate (1) defendants' knowing and wilful participation in a scheme or artifice to defraud, (2) with the specific attempt to defraud, and (3) the use of mails or interstate wire communication in furtherance of the scheme. <u>United States v. Antico</u>, 275 F.3d 245 (3d Cir.2001). Mail fraud is present as long as the mailing is incident to an essential part of the scheme. <u>Schmuck v. United States</u>, 489 U.S. 705 (1989). The ultimate scheme to defraud must involve a fraudulent misrepresentation or an omission that is "reasonably calculated to deceive a person of ordinary prudence and comprehension." <u>Grider v. Keystone Health Plan, Central, Inc.</u>, 2003 WL 22182905 (E.D.Pa.2003); citing <u>Kehr Packages, Inc. v. Sidelcor, Inc</u>., 926 F.2d 1406 (3d Cir.1991).

Furthermore, a doctor's submission, via U.S. Mail, of false, misleading, or non-supervised claims was found to constitute acts of mail fraud. <u>United States v. Talbott</u>, 590 S.2d 192 (6th Cir.1978); <u>United States v. Worthington</u>, 698 S.2d 820 (6th Cir.1983); <u>United States v. Campbell</u>, 845 S.2d 1374 (6th Cir.1988); <u>United States v. Siddiqi</u>, 959 S.2d 1167 (2d Cir.1992); <u>United States v. Nicholas</u>, 1992 WL 238264 (6th Cir.1992). Predicate acts of mail fraud can be demonstrated where the documents mailed "were fraudulent in that they described and sought payment for medical treatment that was unnecessary or never provided . . . " as part of a "related and continuous pattern of fraud" and were part of a common scheme to obtain payments from insurance companies. <u>State Farm Mutual Auto Ins. Co. v. Macris</u>, 2003 WL 924615 (E.D.Pa.2003).

B. <u>Evidence</u>

HealthGuard submits the following as evidence of the above allegations:

- Dr. Raab, President of Greenfield, specifically stated that "I felt the tests were unnecessary and did not contribute to the treatment that was given." Raab Deposition, pg. 64, lines 2-5.

- HealthGuard's expert, Dr. Shymansky, opines that a substantial number of claims submitted to HealthGuard, and specifically identified in HealthGuard's Amended False Claims Chart, were either not performed, excessive, medically unnecessary, identical to

       nearly every patient regardless of their particular condition or were an overuse of diagnostic studies/procedures. See Report of Dr. Shymansky, pages 15-16.

- At trial, the Claims Manager of Healthguard, Andrea Russo, will testify to the fact that the claims were submitted to Healthguard via the U.S. Mail.

- The Affidavits of Drs. Colditz and Wallace confirm the fraudulent nature of these medical claims.

## IV. RELATEDNESS

### A. Standard

The relatedness requirement for a pattern of racketeering activity was satisfied where unspecified predicate acts of mail fraud were all related to a common goal. Banks v. Wolk, 918 F.2d 418 (3d Cir.1990). Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." State Farm Mutual Automobile Ins. Co. v. Makris, 2003 WL 924615 (E.D.Pa.2003); citing Tabas v. Tabas, 47 F.3d 1280 (3d Cir.1995).

### B. Evidence

Defendants' Motion for Summary Judgment does not challenge the allegation in Healthguard's Amended Complaint concerning relatedness. Healthguard's evidence, to be introduced at trial, includes the following:

- Defendants' practice of submitting hundreds of medical claims for services that were either not performed by a physician, were not performed at all or were not medically necessary or appropriate, for the common related purpose of increasing the profitability of their enterprise by defrauding HealthGuard. See Report of Dr. Shymansky, pg. 15-16.

- Evidence presented at trial will permit the trier of fact to reasonably conclude that Defendants' predicate acts of mail fraud had the same purpose, the same results (obtaining payment), the same participants (MLM, Mark and Steven Gartenberg, Mark Tishler, Greenfield and Premier), and the same victim (HealthGuard).

- Drs. Colditz and Wallace will confirm and elaborate upon the relatedness of the predicate acts of mail fraud.

- HealthGuard's Amended False Claims Chart confirms the common goal of Defendants' scheme: i.e., to obtain payment from HealthGuard for fraudulent claims.

## V.     COMMON SCHEME

A.     <u>Standard</u>

The amended complaint and RICO Case Statement alleged mail fraud with sufficient particularity to comply with the requirements of Rule 9(b) where it was alleged that the acts of mail fraud were part of a common scheme to obtain payments from plaintiff and other insurance companies. <u>State Farm Mutual Auto Ins. Co. v. Makris</u>, 2003 WL 924615 (E.D.Pa.2003).

B.     <u>Evidence</u>

Defendants' plan, in essence, was quite simple. Steven Gartenberg hired Dr. Raab to incorporate Greenfield into a medical practice and to serve as the acting president. Mark Tischler hired Dr. Gyening to likewise incorporate Premier into a physician's practice and to serve as its president. Once incorporated, Defendants began to bill for procedures that a chiropractor's practice could not have lawfully billed for unless performed by a physician. However, Dr. Raab worked only part-time, and was not present in the office two to three days each week. The Premier practice, according to Dr. Gyening, was incorporated without her permission and without her ever exercising any control over the management of Premier whatsoever. The individual Defendants funneled insured "patients" to the Greenfield and Premier practices through direct solicitation. This point is significant because claims submitted for medicare patients are subject to much stricter scrutiny then those submitted to a private insurer. The effective control the individual Defendants maintained over the Greenfield practice is obvious in that they dictated which patients would be seen on which day and at what time. (Affidavit of Dr. Colditz, pg. 3.) The individual Defendants pressured other employees (i.e., Drs. Colditz and Wallace) to perform more extensive, medically unnecessary and/or inappropriate services and were then responsible for preparing the invoices which were then mailed to HealthGuard for payment. (Affidavits of Drs. Colditz and Wallace, pg. 2-3.) This is the common scheme, developed by Defendants, which defrauded HealthGuard. Furthermore, HealthGuard has provided the following:

- Dr. Raab has indicated that the treatment plans for Greenfield's "patients" were created by Mark Tischler. Raab Deposition, pg. 21, lines 9-12.

- Dr. Raab has also stated that it was his belief that billing information was forwarded by Dr. Colditz to Bala Cynwood. Raab Deposition, pg. 21, lines 19-21.

- Dr. Raab believed that Greenfield was a subsidiary of Bala or Mr. Gartenberg. Raab Deposition, pg. 75, lines 24-25.

- Dr. Raab also stated that he was unsure where MLM fit into the entire process other than it was the name at Bala. Raab Deposition, pg. 75, lines 24-25.

- Dr. Raab has indicated that Mark Tischler asked for his signature so that he (Tischler) could make a rubber stamp of the same. Raab Deposition, pg. 13, lines 20-22.

- Dr. Raab further stated that he gave his consent for Mark Tischler to use his signature stamp on the Greenfield checking account. Raab Deposition, pg. 14, lines 14-17.

**VI.    PATTERN OF RACKETEERING ACTIVITY**

    A.    <u>Standard</u>

A pattern of racketeering activity requires two acts of racketeering activity within a ten year period. 18 U.S.C.A. § 1961(5). In determining whether a pattern of racketeering activity has been established in a given case, the Third Circuit has set forth the following six factors for considerations: (1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarities of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity. <u>Tabas v. Tabas</u>, 47 F.3d 1280 (3d Cir.1995), citing <u>Barticheck v. Fidelity Union Bank/First National State</u>, 832 F.2d 36 (3d Cir.1987). A plaintiff must also show that the predicate acts are related and that they amount to or pose a threat of continued criminal activity. <u>Tabas</u>, supra, citing <u>H.J., Inc. v. Northwestern Bell Telephone Co</u>., 492 U.S. 229 (1989). As the relatedness element has been previously discussed, the continuity requirement will be addressed. In explaining how a plaintiff could make a showing of continuity, the Court described continuity as "both a closed-and-open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." <u>H.J., Inc</u>., 492 U.S. at 241. The Court specifically included, as an example of continuity, an ongoing entity that commits the predicate acts as its regular way of doing business. <u>Id</u>. The Court stated:

> . . . the continuity requirement is likewise satisfied where it is shown that the predicate acts are a regular way of conducting defendants ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or conducting or participating in an ongoing and legitimate RICO "enterprise."

Id. at 243. The Third Circuit has found that the clear implication of this language is that the "ambit of RICO may encompass a 'legitimate' businessman who regularly conducts his business through illegitimate means, that is, "who repeatedly defrauds those of whom who deals and in the process commits predicate acts, for instance by using the postal service as a means of accomplishing his scheme." <u>Tabas</u>, 47 F.3d at 1293.

    B.    <u>Evidence</u>

Turning to specific evidence of how Defendants' conduct satisfies the above-referenced authority, HealthGuard offers the following:

1. <u>Number of Unlawful Acts</u>. Healthguard has specifically identified, down to the individual patient and procedure, hundreds of claims that were submitted by MLM, in concert with Greenfield, that were for services that were either not performed, not medically necessary, or for procedures that were required to have been performed by a physician, but were in fact performed by a chiropractor. These claims are set forth in detail in HealthGuard's Amended False Claims Chart. Dr. Shymansky will testify at trial, consistent with her report, that these claims were improperly submitted.

2. <u>Length of time over which the acts were committed</u>. As per the dates on HealthGuard's Amended False Claims Chart, Defendants knowingly submitted claims to HealthGuard that were materially false and misleading for a period of <u>at least</u> twenty-six (26) months.

3. <u>The similarity of the acts</u>. The fraudulent acts involved herein were nearly identical because the acts themselves have become Defendants' regular way of doing business. Each predicate act of submitting materially false or misleading claims was part of the overall scheme, conducted by Defendants, to defraud HealthGuard. The predicate acts herein involved are identical in that they were committed for the same purpose, with the same result, the same participants, and the same victim. In accordance with their affidavits, Drs. Colditz and Wallace will testify at trial consistent with the above referenced fraudulent scheme.

4. <u>The number of victims</u>. HealthGuard is the sole victim involved in the case presently before the Court.

5. <u>The number of perpetrators</u>. The perpetrators of this common plan include both individuals and the corporate entities they control. Healthguard anticipates the evidence and testimony presented at trial will demonstrate that as owners/officers of MLM, the individual Defendants performed all billing for, and received all the receipts of, Greenfield and Premier, payed Greenfield and Premier's employees, rents and general overhead, and kept all remaining cash.

6. <u>Character of the unlawful activity</u>. The nature of the unlawful activity is as follows. Dr. Raab was hired by Steven Gartenberg (See Agreement). Dr. Gyening was hired by Mark Tischler. These hirings were the beginning of Defendants' scheme/common plan.

    Per the deposition of Dr. Raab and letter from Dr. Gyening, individual Defendants instructed these doctors to incorporate the Greenfield and Premier practices into medical practices under Pennsylvania Law. Once incorporated as a medical practices, MLM was able to bill insurance providers for procedures it could not have before a medical doctor was employed by the practices. Defendants allege in their Motion for Summary Judgment that none of the individual Defendants had any control/ownership of either the Greenfield or Premier practices. However, they have failed to explain why Steven Gartenberg prepared the employment agreement on behalf of <u>Greenfield</u>. This control has been further corroborated by the Affidavits of Drs. Colditz (pg. 2-3) and Wallace (pg. 2-3).

- In a correspondence dated February 25, 2003, Dr. Gyening informed this Honorable Court that she had been hired by <u>Mark Tischler</u> to be an employee of Greenfield. According to Dr. Gyening, Mark Tischler directed her to incorporate another medical practice, Premier. Despite Dr. Gyening's explicit direction to delay the filing, Premier was incorporated. Dr. Gyening confirmed HealthGuard's allegation that Defendants' scheme was illegal. HealthGuard anticipates that Dr. Gyening will testify at trial consistent with the representations contained in her letter.

- The individual Defendants directed MLM to execute a telemarketing scheme with the purpose of inducing only individuals with health insurance to seek services at Greenfield. This practice was again confirmed by Drs. Colditz and Wallace (Colditz Affidavit, pg. 2-3, Wallace Affidavit, pg. 2-3). It was after patients, solicited by MLM's marketing scheme, reported to Greenfield that the nature of the racketeering unfolded. Patients were routinely subjected to medically unnecessary procedures. See Report of Dr. Shymansky, at page 15. Dr. Shymansky also indicated that: "The treatment plan for each patient was essentially the same. Nearly every patient, regardless of diagnosis ranging from shoulder pain to fibromyalgia, received trigger point injections for nerve blocks . . . the treatment plan did not appear to be tailored for the patient individually. The number of services provided appears to be in excess of what would be expected. . . . the documentation submitted and in particular the submission progress notes did not substantiate the medical necessity for the diagnostic studies performed nor the medical necessity for the frequency of such studies." See Report of Dr. Shymansky, pg. 15-16. When claims were ultimately submitted to HealthGuard for payment, the claims were for services that were either medically unnecessary, medically inappropriate, or for services

that were not performed at all. HealthGuard has provided a Revised False Medical Claims Chart which specifically sets forth each and every claim that falls into one of the previously referenced categories.

The above-referenced evidence ultimately shows that there are issues of fact dealing with the propriety of the services that were submitted for payment and also the amount of control individual Defendants maintained over the Greenfield and Premier practices. As such, summary judgment is not appropriate in the instant litigation.

Respectfully submitted,

HARTMAN UNDERHILL & BRUBAKER LLP

By: _____
Andrew F. Lucarelli, Attorney ID 15421
Robert M. Frankhouser, Attorney ID 29998
221 East Chestnut Street
Lancaster, PA 17602
(717) 299-7254

Date: _____