**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HEALTHGUARD OF LANCASTER, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| MARK GARTENBERG; STEVEN | : | |
| GARTENBERG; MARK TISCHLER; | : | |
| GREENFIELD SPORTS MEDICINE & | : | |
| REHAB, P.C.; PREMIER SPORTS MEDICINE & | : | |
| REHAB CENTER, P.C.; MAIN LINE MEDICAL | : | |
| SERVICES, INC., | : | |
| Defendants | : | NO. 02-2611 |

**MEMORANDUM**

Baylson, J.                                                        **March 5, 2004**

I.    **Statement of the Case**

Plaintiff is a health maintenance organization which has brought a civil RICO claim

against Defendants, alleging fraudulent billing processes in providing medical and/or

chiropractic services in the Lancaster, Pennsylvania area.  The issues involved in this case are

serious, as any fraudulent diversion of healthcare funds for fraud must, if proven, be dealt with

severely.  As discussed below, although the record contains evidence of fraud, the Court

concludes that Plaintiff has been unable to connect the dots of fraud to the rigorous requirements

of civil RICO.  Thus, Defendants' Motion for Summary Judgment will be granted, and its state

law claims will be dismissed without prejudice for refiling, in state court, should Plaintiff so

choose.

On December 6, 2002, the Court granted Defendants' Motion to Dismiss Plaintiff's

original RICO Complaint, which also asserted various state law claims (insurance fraud,

common law fraud, and breach of warranty), but granted Plaintiff leave to file an Amended

Complaint along with a RICO Case Statement.  Plaintiff did so and engaged in discovery for a

number of months.  On October 8, 2003, Defendants jointly moved for summary judgment,

asserting that Plaintiff, despite completion of discovery, has not demonstrated evidence to

support the elements of RICO, or any genuine issues of fact for trial as to the RICO claims.

Defendants' Motion states that it relies on "the pleadings, answers to interrogatories, and

deposition testimony of Dr. David Raab to show that Healthguard has neither alleged nor

produced evidence of any scheme to defraud or any specific predicate acts constituting a pattern

of racketeering activity."  In opposition, Plaintiff has relied on affidavits of two chiropractors

and one medical doctor, who were employed by one or more of the Defendants, and a large

group of papers summarizing allegedly fraudulent bills submitted by Defendant Main Line

Medical Services, Inc. ("MLM") to Plaintiff, but has not submitted any deposition excerpts or

other documents.

Prior to oral argument on December 23, 2003, the Court requested Plaintiff to be

prepared at the oral argument to document its evidence and supporting case law as to several

elements of RICO (Docket No. 51).

## II.    <u>Statement of Facts and Contentions</u>

Plaintiff is a health maintenance organization with 100,000 members, which operates in

and around Lancaster, Pennsylvania.  As Plaintiff describes its operations, Healthguard members

receive medical services from participating healthcare providers, such as Defendants, who

submit insurance claims to Healthguard seeking payment for services rendered.  When a

healthcare provider submits a claim for payment, the provider warrants to Healthguard that the

services identified in the claim were actually provided in the manner described in the claim and were medically appropriate. Upon receipt of a claim, Healthguard forwards payment to the healthcare provider on behalf of the member.

Plaintiff alleges that Defendants, who operate a chiropractic business and provide chiropractic services to Healthguard members, devised a scheme to make their business more profitable, but in doing so, engaged in various fraudulent practices, including submitting false claims for medical services. Plaintiff asserts that the claims submitted under the provider number for one physician, Dr. David Raab, described medical services that either were not performed by a physician, were not performed properly, were not performed at all, or were not medically necessary or appropriate. Although Plaintiff has demonstrated genuine issues of fact as to elements of the common law tort of fraud, the issue before the Court is whether there is sufficient evidence meeting the requirements of RICO.

Plaintiff's Amended Complaint and RICO case statement asserts that the RICO scheme was implemented through one of the Defendants, MLM, a management company owned and operated by other Defendants, which conducted extensive telemarketing to solicit patients for Defendants' medical practices, and then processed the insurance claims generated by each practice. Plaintiff asserts that in conducting the affairs of MLM, Defendants caused thousands of fraudulent insurance claims to be sent through the U.S. mail to Healthguard (and other health insurers) for processing and payment.

## III.   Summary Judgment Motion

The first issue is whether the Defendants have properly supported their Motion for Summary Judgment. In its landmark decision in Celotex Corp. v. Catrett, 477 U.S. 317 (1986),

the Supreme Court rejected the holdings of some lower courts which had required the moving

party to submit affidavits or other sworn materials to contradict the pleadings of the non-moving

party, and held that the moving party need only "show" the court where there was one or more

deficiencies in the existence of an element essential to the non-moving party's case and on which

the non-moving party will bear the burden of proof at trial:

> In our view, the plain language of Rule 56(c) mandates the entry of
> summary judgment, after adequate time for discovery and upon
> motion, against a party who fails to make a showing sufficient to
> establish the existence of an element essential to that party's case,
> and on which that party will bear the burden of proof at trial.

* * * * * *

> Of course, a party seeking summary judgment always bears the
> initial responsibility of informing the district court of the basis for
> its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

* * * * * *

> In cases like the instant one, where the nonmoving party will bear
> the burden of proof at trial on a dispositive issue, a summary
> judgment motion may properly be made in reliance solely on the
> "pleadings, depositions, answers to interrogatories, and admissions
> on file."  Such a motion, whether or not accompanied by affidavits,
> will be "made and supported as provided in this rule," and Rule
> 56(e) therefore requires the nonmoving party to go beyond the
> pleadings and by her own affidavits, or by the "depositions,
> answers to interrogatories, and admissions on file," designate
> "specific facts showing that there is a genuine issue for trial."

* * * * * *

> Instead, as we have explained, the burden on the moving party may
> be discharged by "showing" – that is, pointing out to the district
> court – that there is an absence of evidence to support the
> nonmoving party's case.

-4-

477. U.S. at 322-25.

First, Defendants rely on Plaintiff's pleadings, including the RICO Case Statement which the Court required at the outset of the case as indicative of its claim that Plaintiff has not presented sufficient evidence to create a triable issue of fact for trial. As discussed above, this satisfies Defendant's burden, under Rule 56 procedure. However, Plaintiff cannot rely on its own unsworn pleadings to rebut a motion for summary judgment, rather Plaintiff must demonstrate to the Court that it has sufficient evidence to create a triable issue of fact as required by Celotex. See Id. at 322 (summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); see also Fed R. Civ. P. 56(e) ("the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

Second, Defendants rely on their own answers to certain interrogatories served by Plaintiff. In the interrogatories, the individual Defendants describe their professional qualifications and their relationship to the corporate entities. Defendant Mark Gartenberg does not identify himself as a chiropractor or other health professional, nor of having any role as an officer or a director of any of the Defendant corporations. (M.G. Interrog. ¶¶ 4,7.) He was, however, an employee of MLM and the father of Defendant Steven Gartenberg. (Id. ¶ 6.) Steven Gartenberg asserts that he is the sole shareholder, owner, director and officer of MLM since December 1998, and is also an officer of a non-party entity, CMS, Inc., which he describes as doing telemarketing for Greenfield. (S.G. Interrog. ¶¶ 4, 8.) The other individual Defendant, Mark Tischler, describes himself as a chiropractor who has been an employee of Greenfield

(M.T. Interrog. ¶ 4) and MLM at various times, and was also a director and officer of a non-party entity referred to as Bala Medical Management ("Bala"), from 1999-2002. (Id.)[1]

Although normally answers to interrogatories are used by the party propounding the interrogatories, there is no reason, under the rules and decided cases under Rule 33 of the Federal Rules of Civil Procedure, that a party may not use his or its own sworn answers to interrogatories, which are not otherwise contested to prove a point in supporting a motion for summary judgment.[2] See Celotex, supra at 325 (explaining that "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."); Santa Fe Natural Tobacco Co. v. Judge, 963 F. Supp. 437, 439 (M.D. Pa.1997) (granting a plaintiff's motion for summary judgment where the plaintiff supported its motion with defendant's answers to interrogatories).

Third, Defendants rely on the deposition of Dr. David Raab,[3] a long-standing physician in the Lancaster, Pennsylvania area, who had retired from various private practices and then took a job with Defendant Greenfield Sports Medicine and Rehab, P.C. ("Greenfield") as medical director – a position in which he was not required to fully understand anything about the

---

[1] Bala is not further identified in Defendants' papers, but there are implications that Bala had a role in the relationships among the various individuals and corporate Defendants. However, it does not appear to have been pursued by Plaintiff or explained by Defendants. There is little in the record as to Bala Medical Management, Inc. Dr. Raab testified that Bala provided unspecified services for Greenfield (Raab Dep. at 11, 71). Tischler was the president and sole shareholder of Bala (see M.T. Interrog. ¶¶ 4, 8).

[2] It should be noted that these answers to interrogatories are not self-serving narratives, but are merely descriptive. It is also necessary to point out that the Defendants interposed so-called "form objections" to the interrogatories before answering them. However, Plaintiff does not appear to have contested the adequacy or accuracy of the answers, and thus the Court will consider them.

[3] Defense Counsel deposed Dr. Raab. Plaintiff's counsel did not ask any questions. The record shows that Plaintiff's counsel had previously interviewed Dr. Raab. There is no affidavit from Dr. Raab, in the record, further explaining his knowledge of the facts.

business side of Greenfield.  Dr. Raab worked at Greenfield from approximately May 17, 1999

to sometime in November of 2000.  Prior to commencing his employment, Dr. Raab signed the

incorporation of Greenfield on April 22, 1999.  He also signed a consent to be the sole Director

of the Board of Directors of Greenfield, which indicated that he was also President and

Treasurer, and that Defendant Mark Tischler would be Secretary, (see Exhibits 3-4), and he

signed a Service Agreement between Greenfield and a non-party, Bala Medical Management,

Inc., dated April 22, 1999, in which Dr. Raab summarized in his deposition as providing that he

would make medical decisions, but not business decisions on behalf of Greenfield.

Dr. Raab also testified to his work in reviewing different medical forms, including filling

out claim sheets that MLM submitted to Plaintiff.  He had the impression, but had no direct

evidence to support it, that the Gartenberg Defendants controlled Greenfield and that Greenfield

was a subsidiary of Bala.  (Raab Dep. at 70, 75).  Specifically, Raab stated that he did not know

exactly what the relationship was between Greenfield, Bala and the Gartenberg defendants.  (Id.

at 75.)  He also stated that he did not know whether or not Tischler was the president of Bala but

knew that Tischler did communicate with Bala.  (Id. at 70-71)  However, the record contains no

evidence as to the content of Tischler's communications with Bala.  Finally, after working at

Greenfield for approximately eighteen months, Dr. Raab left because he came to believe that a

number of the tests that were being performed were unnecessary (Id. at 58-59, 64).

In opposition to summary judgment, Plaintiff supplies three affidavits by doctors who

were employed by one or more of the Defendants, and the aforementioned large volume of

billing statements.  Although Plaintiff submitted an expert report as part of its papers in

opposition, it is unsworn and this Court cannot rely upon the expert statement.  Small v. Lehman,

98 F.3d 762, 765 (3d Cir. 1996) ("Rule 56 of the Federal Rules of Civil Procedure states that

motions both for and in opposition to summary judgment may be supported by affidavits;

unsworn statements, such as those relied upon in the instant matter, fail to meet this

requirement.")  Plaintiff has not submitted any other factual materials.  It does not appear from

the record that any of the individual Defendants were ever deposed, or that Plaintiff invoked

Federal Rule of Civil Procedure 30(b)(6) and deposed a representative of any of the corporate

defendants.

**IV.    RICO Requirements**

The Amended Complaint in this case (¶¶ 36-37) charged Defendants of violating two

sections of RICO, 18 U.S.C. §§ 1962(c) and (d), which are defined as follows:

> (c) It shall be unlawful for any person employed by or associated
> with any enterprise engaged in, or the activities of which affect,
> interstate or foreign commerce, to conduct or participate, directly
> or indirectly, in the conduct of such enterprise's affairs through a
> pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of
> the provisions of subsection (a), (b), or (c) of this section.

As the Supreme Court has held in Sedima SPRL v. Imrex Co., 473 U.S. 479, 496 (1985),

"a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

activity as well as injury resulting from the conduct constituting a violation."  Prior to the oral

argument on December 23, 2003, the Court issued an Order requesting Plaintiff to be prepared to

demonstrate the existence of a genuine issue for trial on several of these elements including

conspiracy as charged in 18 U.S.C. § 1962(d), predicate acts (which are defined in the statute),

relatedness (of the various predicate acts to the alleged pattern of racketeering activity), and also

what evidence there is that injury was suffered as a result of the activities alleged, and also what

evidence Healthguard had, in the record, to support its definition of an "enterprise."

After review of the papers and the arguments of counsel, the Court has identified several areas in which Plaintiff has failed to establish the elements of RICO liability:

1.    A confusing and legally insufficient identification of an "enterprise."

2.    A lack of evidence that any of the Defendants were in "control" of the enterprise.

3.    A lack of evidence to show that there was a "pattern" of racketeering activity.

4.    A lack of evidence of conspiracy.

**A.    The "Enterprise"**

The Amended Complaint, ¶ 30, and the RICO Case Statement, ¶ C(1), alleged that MLM is the "enterprise." In filing its response to the Court's Order of December 11, 2003, Plaintiff asserted that MLM "constituted an enterprise through which 'persons' Mark Gartenberg, Steven Gartenberg, and Mark Tischler acted." However, at oral argument Healthguard's counsel identified the enterprise as "a combination of individuals with professional corporations known as Greenfield Sports Medicine and Premier Sports Medicine . . . all of the individuals . . . and the two professional corporations . . . as well as the billing enterprise [MLM]." Plaintiff's counsel made it explicit that the enterprise "is a combination of the Defendants." Asked whether there is any difference between the Defendants and the enterprise, he said "the Defendants made up the enterprise, each of the entities provided a different piece." In response to a question as to whether the enterprise and the Defendants are identical, Plaintiff's counsel unequivocally stated "yes." (N.T. at 11-12). Plaintiff's counsel subsequently articulated this contention as follows: "It's the individuals and Main Line Medical acting through an otherwise legitimate business organization, i.e., Greenfield and Premier." (N.T. p. 37).

Section 1961(4) provides that the term "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  The leading Supreme Court case interpreting the enterprise requirement is United States v. Turkette, 452 U.S. 576 (1981) in which the court noted that the term encompasses both legitimate and illegitimate organizations without distinction and that it can be proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.  The court noted that there is a difference between the "enterprise" and "pattern" requirements: "The 'enterprise' is not the 'pattern of racketeering activity', it is an entity separate and apart from the pattern of activity in which it engages.  452 U.S. at 583.

Much has been written about the requirement of an "enterprise" in civil RICO cases.  See generally, Gregory P. Joseph, Civil Rico: A Definitive Guide 67-79 (2d Ed. 2000).  In this case, the Court finds it helpful to distinguish between the elements of common law fraud and the elements of RICO as follows: proving common law fraud requires a showing of fraudulent statements made with the intent to deceive someone, see Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 296 (3d Cir. 1991) (noting that common law fraud requires that there be a misrepresentation made with the intent that the receiver of the misrepresentation be induced to act in reliance thereof), however, in order for a plaintiff to turn a fraud case into RICO, the plaintiff must also show that the fraud was carried out through the operation of what may functionally be referred to as a "superstructure" which the RICO statute calls an "enterprise."  In other words, the plaintiff proceeding to trial in a RICO case must show more than fraud.  It must show that the conduct of the fraudulent scheme was perpetrated through an enterprise (either an

existing entity or an association of individuals and entities).

Federal courts have required a showing of distinctiveness between the enterprise and the individuals who are allegedly controlling the enterprise.  It must be noted that only the person and not the enterprise is liable under § 1962(c).  See Hirsch v. Enright Refining Co., 751 F.2d 628, 633 (3d Cir. 1984) ("the 'person' subject to liability cannot be the same entity as the 'enterprise.'").

The Third Circuit clarified this rule in Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258 (3d Cir. 1995), in which a RICO plaintiff alleged the existence of an enterprise consisting of a corporation and its officers and employees, who managed the corporation through a pattern of racketeering activity.  After a trial, the jury found for plaintiff and awarded damages against the individual defendants.  Although Jaguar Cars is sometimes referred to as a case that bears on the appropriate definition of an "enterprise," its holding is really confined to the requirement of a "person" in control of an "enterprise" with a conclusion "that when officers and/or employees operate and manage a legitimate corporation, and use it to conduct a pattern of racketeering activity in interstate commerce, those defendant persons are properly liable under § 1962(c)." 46 F.3d at 269.  In Jaguar Cars, the theory of liability was not dissimilar to the theory in the present case.  Plaintiff, Jaguar Automobile Company, accused the defendants, operating a Jaguar dealership, of fraud in the handling of warranty claims, specifically that the defendants submitted, and were paid, for warranty claims for work that was never done, or was grossly misrepresented.  The plaintiff alleged that Royal Oaks [the dealership] "is the enterprise through which the defendants conducted their racketeering activity."  See 46 F.3d at 264.  The defendants asserted that this was a fatal designation of an enterprise because the plaintiff had ignored the

distinctiveness requirement, and that the "person" in "control" (i.e., the defendants) could not be the same as the enterprise.

Although the Third Circuit in <u>Jaguar Cars</u> never specifically ruled on the propriety of the designated "enterprise", it did find that under the Supreme Court's decision in <u>Reves v. Ernst & Young</u>, 507 U.S. 170 (1993), "liability under § 1962(c) is limited to those who 'participate in the operation or management of the enterprise itself.'" 46 F.3d at 265-66. Under this holding, the Third Circuit concluded, (and in the process abrogated earlier holdings to the contrary), that the distinctiveness requirement was satisfied when officers and employees of the corporation operate and manage a legitimate corporation and use it to conduct a pattern of racketeering activity.

More recently, the Supreme Court in <u>Cedric Kushner Motions Ltd. v. King</u>, 533 U.S. 158 (2001) endorsed the holding in <u>Jaguar Cars</u> and concluded that the defendant in that case was a "person" (the president and sole shareholder of a corporation) who was sufficiently distinct from the alleged enterprise, the corporation itself, to satisfy the enterprise/person distinctiveness requirement. The court specifically noted the principle that in order to establish liability under § 1962(c), a party must allege a "person" who is separate and distinct from the alleged enterprise. The Supreme Court concluded that under circumstances where "a corporate employee, acting within the scope of his authority, allegedly conducts the corporation's affairs in a RICO-forbidden way . . . . [that the] corporate owner/employee . . . is distinct from the corporation itself." <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. at 162.

Plaintiff asserts that its definition of an enterprise consisting of all the Defendants is appropriate, notwithstanding the lack of distinctiveness, under the <u>Jaguar Cars</u> ruling, because the Plaintiff alleges, as in <u>Jaguar Cars</u>, that the individual Defendants used at least one of the

-12-

corporate Defendants (MLM) to conduct the pattern of racketeering activity.  In <u>Jaguar Cars</u>, the Third Circuit noted (despite the caption of the case) that "Jaguar has not brought a claim against Royal Oaks, but instead seeks recovery from the [individual] defendants, as persons operating and managing the Royal Oaks enterprise through a pattern of racketeering activity."  46 F.3d at 268.  Thus, in <u>Jaguar Cars</u>, the enterprise and the defendants were not identical.

Although the Amended Complaint and RICO Case Statement assert that the "enterprise" is MLM, the above-quoted statements at oral argument contradict that, and ask the Court to allow the case to proceed with an enterprise identical to the Defendants.  This is clearly not proper under <u>King</u>, because Plaintiff has completely blurred and ignored the distinctiveness requirement.  <u>Accord</u> <u>Baker v. IBP</u>, Nos. 02-3967 & 02-4065, slip op. at 11 (7th Cir. Feb. 4, 2004) (holding that "[w]ithout a difference between the defendant and the 'enterprise' there can be no violation of RICO.").

However, if the Court were to ignore counsel's expanded definition of an enterprise and consider that the enterprise is, as alleged in the Amended Complaint and RICO Case Statement, limited to MLM,  the evidence still does not withstand summary judgment.  Virtually the only evidence in the record as to the affairs of MLM comes from its own answers to interrogatories.  MLM is owned and controlled by Defendant Steven Gartenberg, (MLM Interrog. ¶¶ 3, 5), but it states that it has no written or oral management, marketing or consulting agreements with Defendants Tischler, Greenfield or Premier.  (<u>Id.</u> ¶ 7.)  It also denies that it provides services to patients, and it has not employed any Pennsylvania licensed healthcare professional other than Steven Gartenberg.  (<u>Id.</u> ¶ 10.)

Considering further Dr. Raab's deposition testimony, although he does refer to MLM at

times, it is clear that he was at least an employee of Greenfield,[4] and that he does not show any personal knowledge of the affairs of MLM. Furthermore, as will be discussed in greater detail below, while three affidavits from doctors who worked for Greenfield refer to MLM, they do so only in the context of MLM performing billing and/or telemarketing services for Greenfield.

Therefore, even assuming that the Court would allow the case to go forward with Plaintiff's original designation of MLM as the "enterprise", there is insufficient evidence in the record as to the function and activities of MLM, and to show that it was through MLM that the other Defendants conducted any pattern of racketeering activity.

**B.    Control**

As noted above, the Third Circuit, in Jaguar Cars, discusses the sufficiency of evidence necessary for a plaintiff to show that a particular defendant was in "control" of the enterprise conducting the pattern of racketeering activity. In that case, the court acknowledged that there was no dispute that the dealership conducted a pattern of racketeering activity. However, one of the individual defendants disputed the sufficiency of the evidence as to whether or not he was one of those in "control" of the enterprise. The court reviewed specific evidence that showed that this individual was a supervisor of someone who was carrying out the illegal scheme, "met with him daily to discuss the operation of the dealership, including its parts and service department, and was majority owner of the dealership, and was otherwise actively involved in its operation." 46 F.3d at 270-71. The court found that the evidence was sufficient for the jury to find that this individual defendant was liable because he was aware of, if not participating in, the

---

[4] Exhibits attached to his deposition show that even if he was not aware of it, Dr. Raab may have been a the sole incorporator, director, president, treasurer and sole shareholder of Greenfield. (Raab Dep. Ex. 2-4.)

illegal scheme.  The court recognized that under <u>Reves</u>, <u>supra</u>, the evidence must show that a defendant participated in the operation or management of the enterprise itself.

The Court will now review the evidence in this case to see whether this requirement is met.  In Plaintiff's response to the Court's Order of December 11, 2003, the Plaintiff relies on the affidavits of Dr. Craig W. Colditz, Dr. Brian F. Wallace, and Dr. Leilani Gyening, but the Court cannot conclude from these affidavits that there is a genuine issue of fact for trial as to the element of "control" regarding any of the Defendants.

Dr. Wallace testified that he was hired by Defendant Tischler, and that his treatments would be billed under Dr. Gyening's physician number.  Dr. Wallace said he was instructed (but does not say by whom) to use a billing code for manual therapy technique, which carried a $100 charge for a chiropractic adjustment for which he had previously charged $25.  He also stated that Defendant Tischler pressured him to "do more testing" and told him that "we must get our numbers up."  Each day Dr. Wallace would receive a phone call from either Mark or Steven Gartenberg inquiring about the number of patients that were seen each day and the amount billed.  The only reference to MLM was that it performed "telemarketing for patients."

The affidavit of Dr. Colditz indicates that he was interviewed by Steven Gartenberg who said he would be employed by a non-party chiropractic management system, in its Lancaster County office.  In this employment, Dr. Colditz received instructions from Defendant Tischler. Initially, Tischler did the billing for the office by entering procedure codes into a computer and transmitting them to MLM.  Colditz later assumed this responsibility and billed for Dr. Raab as well.  Dr. Colditz also said that at the conclusion of each day, Mark Gartenberg called the Lancaster County office to find out the number of new patients that appeared, what had been

-15-

billed for each day, and to advise about what new patients his telemarketing operation had

generated for the next day.  MLM would fax a schedule of new patients generated by its

telemarketing operations for the Lancaster County office.  In Dr. Colditz' experience, the

patients who came to the Greenfield office thought they were coming to a medical practice.  He

also said that he was pressured by Defendant Tischler to perform more testing and on some

unspecified number of occasions where Colditz believed testing was unnecessary for a particular

patient, Tischler directed him to do the testing anyway.

Dr. Gyening had originally submitted an unsworn statement, but at the suggestion of the

Court, Plaintiff provided an affidavit from Dr. Gyening filed as of January 13, 2004, which

mentions several of the Defendants, and reiterates some of the same facts Dr. Wallace provided

as to the method of doing business, billing practices, etc.  She states that after a period of time,

she became concerned that some of the documents relating to the formation of Premier Sports

Medicine and Rehabilitation Center ("Premier"), which she was filling out, should not be

submitted based upon her belief that the activities of Dr. Tischler and MLM were illegal.

Nonetheless, Dr. Gyening testified that despite her objection the documents were filed with the

Commonwealth of Pennsylvania and they listed her as the President of Premier.  This is virtually

the only mention of Defendant Premier in the entire case.

Dr. Raab also provided testimony on the issue of control, but little of it was based on

personal knowledge, except that Defendant Tischler had asked for Dr. Raab's signature so that

Tischler could make a rubberstamp of the same, (Raab Dep. at 13) and that Dr. Raab gave his

consent to Tischler to use his signature stamp on a Greenfield checking account (Id. at 13-14).

Plaintiff fails to connect these facts to any of the alleged racketeering acts by any of the

-16-

Defendants.

On the issue of control, Dr. Raab testified (Id. at 21) that Dr. Tischler instigated the treatment plans, but Dr. Raab did not make any change in the diagnostic procedure, depending on who the carrier was.  Dr. Raab also said that he never received any supervision from Mark or Steven Gartenberg.  He stated that "to my understanding, Greenfield was simply a subsidiary of Bala or Mr. Gartenberg."  (Raab Dep. at 75.)  He did not state the basis of his knowledge.

The above summary of the testimony of the activities of the Defendants only shows that Plaintiff has evidence that they were in formal control (i.e., directors and/or officers) of the various entities.  However, the Court has examined the record and is unable to find that any of the Defendants controlled the "enterprise," however defined, despite contradictory assertions from time to time in this case.

Completely lacking from the record in this case is any direct firsthand testimony as to how the alleged "enterprise" (in either way it has been defined) operated.  Giving Plaintiff every inference, there is basically no information whatsoever about Defendant Premier.  It appears that Defendant Greenfield operated a chiropractic and/or medical practice in the Lancaster area and was a legitimate medical business, seeing and treating patients.  The claim forms submitted on behalf of Greenfield to Plaintiff appear to have been verified by Dr. Raab, and despite this practice having continued for 18 months, it was only the very end of this period, in approximately November of 2000 that Dr. Raab concluded that improper claims were being made.

The evidence does not show that Defendant Tischler, assuming arguendo that he was in control of Greenfield, had any specific role in the alleged "pattern of racketeering."  He may

have on some occasions directed a doctor to do tests the doctor did not think were necessary, and said to one of the doctors that "we need to get our numbers up." While this may constitute evidence of fraud, it certainly is not sufficient to prove that he was in "control" of a racketeering enterprise, as defined by RICO, and as alleged by Plaintiff.

There is no evidence in the record as to activities by Defendant Mark Gartenberg.

As to Defendant Steven Gartenberg, his answers to interrogatories only establish that he was the owner of MLM, he was never an employee of Bala, and he was not a shareholder of any corporate entity that provided management services to the medical or chiropractic practices whose services or bills Healthguard is challenging in this case. This assertion is not challenged by Plaintiff.

Additionally, although the record acknowledges that Steven Gartenberg was in control of MLM, there is no firsthand testimony as to how MLM operated, or how it conducted its day-to-day working relationship with Greenfield or Premier. There is no evidence that Mark or Steven Gartenberg had any participation in the affairs of Greenfield; there is no evidence that Tischler had any participation in the affairs of MLM. The mere fact that MLM had a telemarketing operation that referred patients to Greenfield, or that it performed billing for Greenfield, does not make for fraud, and does not establish that any of these defendants controlled an enterprise engaged in a pattern of racketeering activity.

The Court does acknowledge that the doctors' affidavits do evidence, in general, a practice by Greenfield of billing chiropractic services as medical services, presumably to achieve a higher reimbursement rate. There is also evidence that Greenfield occasionally billed for tests that were not appropriate prescribed or needed. However, there is no quantification whatsoever

of these practices, and although there was evidence that Tischler was the person responsible for more than some of these practices, the record contains no evidence that he was in "control."

The physician affidavits also refer to the fact that Greenfield only wanted to treat patients who had insurance coverage. Although this practice was not uniform, the Court finds nothing illegal about it.

The record evidence would also allow an inference that Greenfield provided services by both a medical and chiropractic doctor. The physician would prescribe diagnostic testing, following which the patient would receive a chiropractic examination and treatment. Dr. Colditz says that the treatment plan for each patient was virtually identical, irrespective of the patient's complaints. Dr. Colditz also says that after procedure codes were entered into the computer at Greenfield, they were electronically transferred to MLM, which also performed billing services. (Colditz Aff. ¶ 5). Once again, the Plaintiff fails to connect this evidence with any act by a particular Defendant that would provide support for a genuine issue for trial that such Defendant was in "control" of an enterprise.

Returning to the issue of the definition of the "enterprise" with respect to the foregoing discussion regarding "control," the Court again concludes that if its ignores the suggestion of Plaintiff's counsel at oral argument that the enterprise is all of the Defendants, and assumes that Plaintiff would, if it could, proceed to trial on its original allegation that the enterprise is MLM, there is insufficient evidence to proceed on that basis. As noted above, the only Defendant as to whom there is any evidence of control regarding MLM is Steven Gartenberg, who was the owner and sole officer of MLM. However, the Court also concludes that the mere ownership of a corporation is not necessarily synonymous with "control" of that corporation for RICO purposes.

See e.g. Jaguar Cars, 46 F.3d at 270-71(examining whether or not a 51% owner of a claimed

enterprise controlled that enterprise).  Rather, there needs to be evidence in the record as to

Steven Gartenberg's activities on a day-to-day, month-to-month or year-to-year basis in order for

the Court to infer that he controlled MLM as a racketeering enterprise.  The only evidence of

MLM's role is that it processed bills and performed telemarketing services for Greenfield.  The

fact that a minor portion of those bills were allegedly, or even presumptively, fraudulent does not

make up the elements of RICO.

 Alternatively, assuming that the enterprise is as described at the oral argument, all of the

Defendants, and the Court ignores the distinctiveness requirement, there is still no evidence that

any of the individual Defendants were in control of all of the organizations named as both

Defendants and members of this enterprise, i.e., MLM, Greenfield and Premier.

 Although Plaintiff, in its Amended Complaint and RICO Case Statement, asserts that all

three of the individual Defendants controlled the enterprise and used the enterprise to conduct a

pattern of racketeering activity, the above review shows there is really nothing in the summary

judgment record to support these contested allegations.  As such, Plaintiff has not met its burden

of coming forward with evidence of a genuine issue for trial.

**V.**  **Pattern of Racketeering Activity**

 In moving for summary judgment, Defendants assert that the Plaintiff has failed to show

a genuine issue of fact for trial on the requirement of a "pattern of racketeering activity."

Defendants' brief relies extensively on the pleadings, i.e., the Amended Complaint and the RICO

Case Statement, but the obligation of the Court is to look at the record of the case as it exists at

this time, including depositions, answers to interrogatories, etc. in determining whether Plaintiff

has come forward with sufficient evidence to show a genuine issue for trial.

The requisite pattern is demonstrated by showing both that the various predicate acts are "related" and also are "continuous".  See H. J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989), Kehr Packages, Inc. v. Fidelcor Inc., 926 F.2d 1406, 1411-12 (3d Cir. 1991).  Plaintiff has shown the requisite predicate acts which took place in this case – namely the mailing of the claim forms, which was allegedly fraudulent and could constitute the crime of mail fraud. Defendants do not dispute that Plaintiff has demonstrated "relatedness".  See (Defendants' Brief at 20.)  However, Defendant does contend that Plaintiff has failed to demonstrate continuity, because Plaintiff only alleges a single victim and a single scheme episode, which began with the incorporation of Greenfield on April 20, 1999 and terminated in October 2000, when Healthguard ceased paying Greenfield's invoices.  Plaintiff asserts that the fraud extended for at least 26 months.  Both parties agree that the leading case on continuity in this Circuit is Tabas v. Tabas, 47 F.3d 1280, 1292 (3d Cir. 1995), which discusses the differences between closed and open-ended continuity.  The Third Circuit has held that one year is not sufficient for a closed-ended scheme.  Hughes v. Consol-Pa Coal Co., 945 F.2d 594 (3d Cir. 1991), cert. denied, 504 U.S. 955 (1992).

At oral argument, Plaintiff's counsel asserted that the scheme was "close-ended" because "it had a defined end, they ceased business and ceased submitting claims." (N.T. 23).  The Court will accept this characterization, but the evidence is too insufficient to form a "pattern."

Although the Court would not grant summary judgment against Plaintiff merely because the Plaintiff was the only victim of the alleged scheme, the lack of evidence as to the manner in which the alleged scheme was carried out is fatal.  The affidavits of the three physicians who

worked at Greenfield only supply sporadic evidence of fraud; they do not establish that there was a routine or even a common or usual manner of treating patients, which is required to establish a pattern. There is an absence of universality about the conduct of the Greenfield office where they worked, from which a jury could find a pattern. Although their affidavits do establish instances of conduct that would be readily characterized as fraudulent, the Court cannot conclude from the affidavits themselves (which along with Dr. Raab's deposition are the only evidence of how the Greenfield practice was conducted) that there is sufficient evidence to show that there existed a "pattern of racketeering activity."

Plaintiff asserts that Defendants submitted hundreds of false claims, which Plaintiff asserts amount to $249,814.11. (N.T. at 21.) In support, Plaintiff refers to a chart (Ex. E), which shows that a large number of claims lacked documentary support. However, the absence of documentation does not equate to fraud. It was incumbent upon Plaintiff to provide an affidavit explaining such a complex document and why the absence of documentation would allow the Court to find a genuine issue of fact for trial. Also, at oral argument, Plaintiff's counsel did not explain how Exhibit E establishes evidence of fraud. (N.T. at 20-22.) Hence, there is no evidence that the uniform practice and procedure of the Greenfield office was to conduct tests that were not needed, or to charge higher rates than allowed, etc. for the patients whose care was outlined in Exhibit E. In fact, there is nothing in the three affidavits or the testimony of Dr. Raab which provides any consistency or quantification whatsoever as to the extent of the alleged fraudulent practices.

Even if the unsworn expert report, excluded above, were to be admitted for the truth of the matters asserted in opposition to summary judgment, the Court notes that it would be of very

limited value.  First, Dr. Shyminsky's expert qualifications are not set forth.  The report is in the

form of a memorandum dated July 8, 2003 to Thomas P. Brennan, Director of Special

Investigations, without indicating the entity to which Mr. Brennan is related.  The report reviews

the records of 35 separate patients of Greenfield, noting progress notes, complaints, treatment

and claims.  The conclusion states in part "the medical necessity for the services billed has not

been established . . ., that virtually every patient received trigger point injections or nerve blocks,

diagnostic studies were performed routinely, and the treatment plan did not appear to be tapered

for the patient individually, the number of services provided appears to be in excess of what

would be expected, the length of treatment appears to be excessive, and exceeded what would

generally be expected per the patient's condition, and the documentation submitted in a

particular physician's progress notes did not substantiate the medical necessity for the diagnostic

studies performed or the medical necessity for the frequency of such studies."

These findings and conclusions may be relevant and important on a claim of fraud, and

they would tend to establish that the mailings of such forms to MLM would constitute "predicate

acts."  However, assuming the existence of mail fraud, it still leaves the Plaintiff's evidence

lacking on the other elements of RICO.  The expert report does not connect the 35 allegedly

fraudulent submissions to the conduct of the enterprise as part of a "pattern" alleged or discuss

the conduct of any of the individuals who are alleged to be in control of the enterprise.

**VI.**    **Conspiracy**

As noted above, the Plaintiff was also proceeding on § 1962(d) which makes it unlawful

for any person to conspire to violate § 1962(c).

Defendants cannot be liable for a conspiracy to violate RICO if the evidence is

insufficient to hold any of them liable for a violation of RICO itself under § 1962(c).  See State

Farm Mut. Auto. Ins. Co. v. Makris, No. 01-5351, 2003 U.S. Dist. LEXIS 3374 (E.D. Pa. Mar. 4,

2003) (noting that an element of a § 1962(c) claim involves "'knowledge that those acts were

part of a pattern of racketeering activity conducted in such a way as to violate section 1962 (a),

(b) or (c).'") (quoting Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989)). Thus, the Court need

not dwell on this except to note that at oral argument the Court queried Plaintiff's counsel on the

allegations of conspiracy, and disputes the adequacy of Plaintiff's reliance on the affidavits of

Drs. Wallace and Colditz, and the subsequently submitted affidavit of Dr. Gyening.  There is

nothing in these affidavits to establish who participated in the illegal conspiracy.

    Thus, Defendants' motion for summary judgment will be granted on Count I.  An

appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HEALTHGUARD OF LANCASTER, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| MARK GARTENBERG; STEVEN | : | |
| GARTENBERG; MARK TISCHLER; | : | |
| GREENFIELD SPORTS MEDICINE & | : | |
| REHAB, P.C.; PREMIER SPORTS MEDICINE & | : | |
| REHAB CENTER, P.C.; MAIN LINE MEDICAL | : | |
| SERVICES, INC., | : | |
| Defendants | : | NO. 02-2611 |

**ORDER**

AND NOW THIS 5th day of March, 2004, it is hereby ORDERED that Defendants'

Motion for Summary Judgment (Docket No. 37) is GRANTED, as to Count I of Plaintiff's

Complaint.  Judgment is entered in favor of Defendants and against Plaintiff as to Count I.

Counts II-IV are dismissed without prejudice for lack of subject matter jurisdiction.  The Clerk is

directed to close this case.

**BY THE COURT:**

_____

**MICHAEL M. BAYLSON, U.S.D.J.**

O:\CIVIL\02-2611 HealthGuard v. Gartenberg\Healthguard Memo 3-1-04.wpd